OLYMPIC ARMS, INC., Appellant,

v.

Phillip R. GREEN, Appellee.

Phillip R. Green, Appellant,

v.

Olympic Arms, Inc., Appellee.

No. 01–02–00781–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 30, 2004.

568

John H. McFarland, Winstead Sechrest & Minick, P.C., Houston, TX, for Appellant.

Matthew Miles Prewett, Cruse, Scott, Henderson & Allen, Richard N. Countiss, Countiss Law Firm, Brian D. Womac, Womac & Associates, Houston, TX, for Appellee.

Panel consists of Justices TAFT, KEYES, and BLAND.

**OPINION**

JANE BLAND, Justice.

In its appeal of this products liability case, appellant, Olympic Arms, Inc. ("Olympic"), appeals a judgment on a jury verdict in favor of appellee, Phillip Green. Green sued Olympic and its co-defendant, Kerry O'Day, for left hand injuries that Green sustained when a rifle barrel—which Olympic had manufactured and O'Day had assembled—exploded. On appeal, Olympic contends that the Civil Practice and Remedies Code required the trial court to submit jury questions that included two settling parties and the plaintiff, so that the jury could compare Olympic's causation with theirs. Olympic further contends that (1) no evidence, or alternatively, insufficient evidence supports Green's claims against Olympic; (2) Olympic conclusively established its substantial alteration defense as a matter of law; (3) the trial court erred in refusing to instruct the jury as to Olympic's defensive theories; (4) the trial court erred in admitting evidence from Green's experts and in excluding evidence supporting Olympic's defensive theories; and (5) the trial court erred in denying Olympic's motion for judgment notwithstanding the verdict as to the jury's failure to award Olympic its attorney's fees and expenses. In his appeal, Green asserts one point of error, in which he contends that the trial court erred in its calculation of pre-judgment interest.

We conclude that the trial court erred in refusing to submit a comparative causation issue to the jury that included the two settling co-defendants and that the error is harmful. We further conclude that legally sufficient evidence supports the jury's verdict, and Olympic is not entitled to rendition of judgment on Green's claims. We therefore reverse the judgment and remand the case for a new trial.

**I. Facts**

In January 1998, Green met O'Day, a gunsmith, at the Houston Safari Show. O'Day enjoyed a reputation for making highly accurate, lightweight guns. In March 1998, Green contracted with O'Day to construct a custom .300 Weatherby Magnum rifle. O'Day ordered the gun barrel for the rifle from Olympic, prepared the barrel and its other component parts, and assembled the firearm.

Olympic sells gun barrel blanks to gunsmiths like O'Day, who then incorporate the Olympic barrels into custom rifles. The gun barrel blank is a steel tube that has been bored, rifled, and contoured to Olympic's specifications. A gunsmith consumer chooses a barrel from the options that Olympic makes available in its catalog. Olympic offers six different barrel contours, including an "Ultra Light Contour"—the one O'Day purchased for Green's rifle.[1]

In July 1998, Green retrieved the rifle and six boxes of hand-loaded ammunition from O'Day and test-fired it. Dissatisfied with the accuracy of the rifle, Green returned it to O'Day, who in turn returned it to Olympic. Olympic replaced the barrel with another Ultra Light Contour barrel.

---

1. Olympic's six contours are entitled (1) "Heavy Barrel # 5," (2) "Varmint Weight Contour # 4," (3) "Heavy Sporter Contour # 3," (4) "Medium Sporter Contour # 2," (5) "Light Sporter Contour # 1," and (6) "Ultra Light Contour." Olympic's catalog depicts a diagram of its barrel blanks and provides three lengthwise measurements and two measurements of the outer-edge diameter of its product. The six contours are distinguished based upon differences in these five measurements.

In August 1998, Green again retrieved the rifle, with the replaced barrel, and test-fired it. Satisfied with its accuracy, Green took it with him on a Canadian hunting trip later that month. Upon arrival, he planned to test-fire the rifle to ensure that its accuracy had not been affected during transit. Green loaded the rifle and pulled the trigger. The rifle barrel exploded, severing his left thumb and injuring two fingers on his left hand.

## II. Procedural History

In addition to suing Olympic and O'Day, Green sued O'Day's company, Match Grade Arms & Ammunition, Inc. ("Match Grade"); Olympic's steel supplier, Earle M. Jorgenson Company ("EMJ"); and EMJ's supplier, Nortec Specialty Steels Company, Inc. ("Nortec"). Green alleged claims for design, manufacturing, and marketing defects; negligence; and breach of warranty against these defendants. On the day of trial, Green settled with EMJ for $75,000 and Nortec for $10,000 and proceeded to trial against Olympic, O'Day, and Match Grade. The next day, Olympic filed an election of settlement credit with the trial court, asking that it receive the sum of the dollar amounts of the EMJ and Nortec settlements pursuant to section 33.014(1) of the Texas Civil Practice and Remedies Code.

At the trial court's charge conference, Olympic objected to the comparative causation issue that the court submitted to the jury on the basis that:

[T]here is some evidence that [EMJ] had negligence, or had some negligence that was a proximate cause to the plaintiff's injuries; and, therefore, their negligence is properly submitted to the trier of fact. And also both [EMJ] and [Nortec's] negligence is properly submitted to the trier of fact under chapter 33, section 33.003 of the Texas Civil Practice

and Remedies Code, which requires that the trier of fact shall consider the negligence of all settling persons.

The trial court overruled Olympic's objection, at which time counsel for Olympic tendered a comparative causation question that included EMJ and Nortec. The trial court refused the question and asked the jury to compare only the causation of Olympic and O'Day.

The jury found that both Olympic and O'Day had manufactured and marketed a defective gun barrel, had breached their implied warranties, and that their negligence proximately caused the rifle barrel to explode. The jury further found that a design defect attributable to O'Day, but not to Olympic, existed in the barrel. The jury placed 50% of the causation of Green's injuries on Olympic and 50% of the causation on O'Day, and awarded Green $500,000 in damages. After a reduction for comparative responsibility, and the addition of pre-judgment interest, the trial court rendered a judgment against Olympic for $275,985, plus post-judgment interest and court costs.

## III. Proportionate Responsibility

Olympic contends that the trial court erred in refusing to submit the comparative causation of EMJ and Nortec, the two settling co-defendants, as well as Green, for proportionate responsibility purposes. In support of its argument, Olympic relies upon Chapter 33 of the Civil Practice and Remedies Code. The version of Chapter 33.003 applicable to this case provided:

The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by

any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1) each claimant;

(2) each defendant;

(3) each settling person; and

(4) each responsible third party who has been joined under Section 33.004.[2]

*See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.02, 2003 Tex. Gen. Laws 847, 855 (current version at Tex. Civ. Prac. & Rem.Code Ann. § 33.003 (Vernon Supp. 2004–2005)). The trier of fact thus must compare the causation of the claimant and any settling party in determining the remaining defendants' proportionate responsibility for any resulting damages. The version of chapter 33.011 applicable to this case defined a settling party as follows:

"Settling person" means a person who at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability pursuant to the provisions of Section 33.001 with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought.

*See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.05, 2003 Tex. Gen. Laws 847, 856 (current version at Tex. Civ. Prac. & Rem.Code Ann. § 33.011(5) (Vernon Supp. 2004–2005)). It is undisputed that Green settled with steel suppliers EMJ and Nortec for $75,000 and $10,000, respectively. EMJ and Nortec were thus settling parties

as contemplated by section 33.011 of the Texas Civil Practice and Remedies Code.

■ Although the current version of Chapter 33 states that such a submission is a mandatory one,[3] the version in effect at the time of this suit provided: "Nothing in this section shall require a submission to the jury of a question regarding conduct by any party absent sufficient evidence to support the submission." *See* Act of May 4, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.10(1), 2003 Tex. Gen. Laws 847, 859. Moreover, under the prior statute, we have conditioned the submission of settling parties on whether legally sufficient evidence supports the settling parties' responsibility for damages. *See J.D. Abrams, Inc. v. McIver*, 966 S.W.2d 87, 90 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (reviewing trial court's refusal to submit jury question on comparative responsibility to determine if legally sufficient evidence supported its submission). We thus review a trial court's refusal to submit a comparative causation issue to the jury by determining whether legally sufficient evidence supports the submission. *Id.; Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992).

■ Olympic contends that Green's expert and O'Day both testified—and therefore presented evidence at trial—that the rifle barrel steel was defective, and the trial court therefore erred in refusing to submit the responsibility of steel suppliers EMJ and Nortec to the jury as settling parties for apportionment of comparative responsibility. We agree. At trial, it was

---

**2.** The 2003 amendments to Sections 33.003 and 33.011 of the Civil Practice and Remedies Code apply only to actions filed on or after July 1, 2003; the law in effect before the 2003 amendments remains in effect for any action filed before July 1, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(c),

2003 Tex. Gen. Laws 847, 899 (referring to Article 4, located at 2003 Tex. Gen. Laws 847, 855). Because this case was filed before July 1, 2003, we apply the law in effect prior to the 2003 amendments.

**3.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.003.

undisputed that EMJ and Nortec had supplied the steel that Olympic used to make Green's barrel blank. Both Green and John Butters, one of Green's expert witnesses, testified that the steel was "bad" and "dirty" and did not meet the requirements of 416 steel, the preferred quality of steel in this application. Moreover, Green's expert metallurgist, Brian McLellan, testified that the steel was full of inclusions and microcracks and that, had the steel contained fewer inclusions, the thickness of the barrel would have been sufficient to withstand the pressure generated by the .300 Weatherby Magnum cartridges. In a deposition that Green offered at trial, Olympic's owner, Bob Schuetz, testified that it had relied on its supplier to provide it with rifle barrel quality steel. Such evidence raises a fact issue as to the settling steel suppliers' potential responsibility for the accident.

■ Green first responds that the trial court did not err in refusing to submit EMJ's and Nortec's responsibility to the jury to determine apportionment because Olympic and Green had nonsuited their affirmative claims against EMJ and Nortec before the trial and, thus, had eliminated any pleadings to support the submission of these settling parties. See TEX.R. CIV. P. 278 (requiring pleadings and evidence for submission of questions, instructions, and definitions).[4] Green ignores, however, Olympic's pleadings against him, which expressly allege that the acts or omissions of third parties caused Green's injuries.

In particular, Olympic's third amended answer alleges the following:

> Plaintiff's damages, if any, were caused by the acts or omissions of others, including, without limitation, Plaintiff, Defendant Kerry O'Day, Match Grade

Arms & Ammunition, Inc., and Earle M. Jorgensen Company d/b/a Jorgensen Steel & Aluminum.

Thus, Green's contention that no pleadings exist to support the submission of EMJ and Nortec because Green and Olympic had nonsuited their claims against these settling parties is without merit. Cf. *Kroger Co. v. Betancourt*, 996 S.W.2d 353, 357–58 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). In *Betancourt*, Kroger failed to file any pleadings asserting that a settling person was liable and failed to file a written election of settlement credit pursuant to Section 33.014. *Id.* The Fourteenth Court of Appeals determined that "there is no cross-action against Crown and no written election for settlement credit, so Kroger has no pleading supporting submission of a comparative responsibility issue." *Id.* at 358. Here, in contrast, Olympic alleged that EMJ and others caused Green's injuries, and Olympic timely had filed a written election for a settlement credit. We thus hold that Olympic satisfied the pleading requirements of rule 278 for the submission of settling defendants.

Second, Green contends that no evidence exists that EMJ was responsible in part for Green's damages because no evidence exists that the steel was defective. Green's contention, however, is inconsistent with the evidence he presented at trial supporting his manufacturing and marketing defect claims. At trial, as set forth in our legal sufficiency analysis, *infra*, Green presented witnesses who testified that the steel was not of adequate quality, that it was "filing cabinet" steel, and that the presence of too many inclusions in the steel caused the rifle barrel to fail. Green himself also testified that the composition of the steel was defective and offered

---

4. Green does not dispute that Olympic timely requested that the trial court include these settling parties in the jury questions regarding comparative causation.

Schuetz's deposition testimony, which showed that Olympic had relied on EMJ to provide it with rifle barrel quality steel. Thus, the evidence that supports Green's claims against Olympic also supports a causation issue to include Olympic's steel suppliers.

■ Third, Green contends that Schuetz's answer to a cross-examination question—that he had no "problems with the quality of steel" that EMJ had provided to Olympic—constitutes a binding judicial admission that Olympic had no claims against EMJ or Nortec.[5] Green relies upon a summary judgment case, in which the Texas Supreme Court defined a judicial admission as "[a]ssertions of fact, not plead in the alternative, in the live pleadings of a party." *Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 568 (Tex.2001). The Texas Supreme Court held that "[a] judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact." *Id.* In *Wolf,* the court determined that the assertions of fact in Wolf's live pleadings that were not pled in the alternative, together with his affirmative agreement in his appellate brief as to the admitted fact, constituted a binding judicial admission for summary judgment purposes. *See id.*

Here, Schuetz's affirmative answer to Green's question on cross-examination does not constitute a binding judicial admission because it is "an assertion of fact" that was not conclusively established in Olympic's live pleadings. *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 905 (Tex.2000) (holding that a judicial admission occurs when assertion of fact is conclusively established in live pleadings, making introduction of other

pleadings or evidence unnecessary). Rather, the content and the quality of the steel were contested issues at trial, and Schuetz testified elsewhere that he had depended on his suppliers for quality control of the steel.

Olympic took the position at trial that the steel was *not* defective, and Green and O'Day both took the position that the steel *was* defective. If the jury disagreed with Olympic and agreed with Green and O'Day, then Olympic was entitled to have the jury examine and compare responsibility between it and the settling defendants for the faulty steel. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.011. The jury had evidence from which it could conclude, and from which Olympic could frame a closing argument, that part of the responsibility for Green's injuries rested with the steel suppliers. We hold that legally sufficient evidence exists to support the submission of a comparative causation issue. Thus, the trial court erred in not submitting the issue of EMJ and Nortec's proportionate responsibility. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.05, 2003 Tex. Gen. Laws 847, 856 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 33.011(5) (Vernon Supp.2004–2005)).

With regard to Olympic's complaint that Green's name also should have been submitted to the jury, the record indicates that neither Olympic, O'Day, nor Green offered evidence sufficient to raise an issue as to Green's comparative fault for the accident. Moreover, Olympic provides neither argument nor record citations to support its assertion that Green caused the barrel explosion. *See* TEX.R.APP. P. 38.1(h). Accordingly, we hold that the trial court did not err in refusing to submit

---

**5.** Green relies on the following testimony:

Q. You don't have any complaints, gripes or any problems with the quality of steel that Earle M. Jorgensen has provided your company; do you?

A. [Schuetz] No sir.

Green's responsibility for comparative causation purposes.

■ A reversal is warranted if the trial court denies a proper submission of a valid theory of recovery raised by the pleadings and the evidence, and the error probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1; *see Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756–57 (Tex.1995); *Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex.1992). We must therefore determine whether the error probably caused the rendition of an improper judgment.

A liable defendant is generally responsible only for the percentage of damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to those damages. *See* Act of May 18, 1995, 74th Leg., R.S., ch. 136, § 33.013, 1995 Tex. Gen. Laws 971, 974 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 33.013 (Vernon Supp.2004–2005)). Here, the jury attributed 50% of the cause of Green's injuries to Olympic and 50% to O'Day. Had it properly been instructed, the jury could have attributed part of the causation placed on Olympic to EMJ, to Nortec, or to both. The jury heard legally sufficient evidence that the settling parties' product could have contributed to the cause of Green's injuries; thus, we cannot conclude that the trial court's failure to submit EMJ's and Nortec's responsibility was harmless error. *See* Tex.R. Civ. P. 44.1.

We hold that the trial court's error in failing to submit the settling co-defendants' responsibility warrants reversal. We now turn to Olympic's legal sufficiency complaints to evaluate whether we should render judgment or, instead, remand the cause for a new trial based upon the charge error.[6]

## IV. Legal Sufficiency of the Evidence—Green's Claims

Olympic contends that the trial court erred in denying its motion for judgment notwithstanding the verdict on Green's products liability, breach of warranty, and negligence claims. We review the denial of a motion for judgment notwithstanding the verdict as a challenge to the legal sufficiency of the evidence. *See Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 400 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). We consider all of the evidence in the light most favorable to the non-movant and disregard all evidence to the contrary. *Russell v. City of Bryan*, 919 S.W.2d 698, 705 (Tex.App.-Houston [14th Dist.] 1996, writ denied). We resolve all reasonable inferences in favor of the non-movant. *Id.* We reverse and render only if no evidence—or less than a scintilla of evidence—exists to support the judgment. *See Scott v. Poindexter*, 53 S.W.3d 28, 32 (Tex.App.-San Antonio 2001, pet. denied).

### A. Manufacturing Defect

■ Olympic contends that the trial court erred in denying its motion for judgment notwithstanding the verdict on its manufacturing defect cause of action be-

---

**6.** Olympic also raises challenges to the factual sufficiency of the evidence. Factually insufficient evidence affords a new trial—the same remedy as charge error. *Compare Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex.1981) (holding that, if court of appeals sustains factual sufficiency point, it must reverse the judgment and remand the cause for new trial), *with Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997) (remand is appropriate if charge improperly instructed jury and legally sufficient evidence exists to support the claim). As we hold that Olympic is entitled to a new trial based on the trial court's harmful charge error, we do not review Olympic's factual insufficiency issues. *See Glover*, 619 S.W.2d at 401–02.

cause no evidence supports the jury's verdict that the barrel blank Olympic manufactured contained a manufacturing defect. Green responds that the jury's verdict is based upon evidence that Olympic, in making its Ultra Light Contour rifle barrels, used steel that was not strong enough to withstand the pressure for its intended use.

■ To recover in strict liability for a manufacturing defect, Green must demonstrate that the rifle barrel was defective when it left Olympic's hands and that the defect was a producing cause of his injuries. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 844 (Tex.2000). "A product has a manufacturing defect if its construction or quality deviates from the specifications or planned output in a way that is unreasonably dangerous." *Id.*

■ Green testified, without objection, that he brought the rifle to Engineering and Fire Investigations ("EFI") to be analyzed and that, when he retrieved his rifle, an EFI employee informed him that the "gun barrel was full of inclusions and this thing should have never been used on a rifle barrel."[7] John Butters, a registered professional engineer, testified that "the only reason that this barrel failed was because it was improperly manufactured steel." Butters further testified that the amount of pressure that it takes to split a pressure vessel "is out of the first book of machine design that an engineer ever gets" and that Green's rifle was "just a pressure vessel." Butters was "absolutely confident" that the barrel's thickness was sufficient to support the amount of pressure generated by firing Green's rifle.

Olympic cross-examined O'Day, eliciting testimony that, if Green's barrel had been made of "quality 416 steel, without the inclusions, [then] it would have been fine." Rex McClellan, a Rice University metallurgist, testified that the steel in the Olympic barrel was "full of inclusions" and "microcracks," which became larger each time the rifle was fired. As the microcracks grew over time, they effectively decreased the wall thickness of the barrel, until the barrel's thickness reached a "critical size" and failed. McClellan testified that the rifle barrel's lack of thickness mattered because "too many inclusions" existed in the steel. Had the steel that composed the barrel not contained such extensive inclusions, the thickness of the barrel would have been sufficient.

Olympic contends that Green failed to demonstrate the existence of any evidence that the Olympic barrel deviated in any way from planned output and that this failure entitles Olympic to judgment as a matter of law. *See Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 434 (Tex.1997) (stating that manufacturing defect is deviation from planned output which renders product unreasonably dangerous). In *Grinnell*, the plaintiffs contended that American manufactured defective cigarettes because they contained pesticide residue. *Id.* at 433. American contended that the Grinnells' manufacturing defect claim based on the presence of pesticide residue was a design defect claim disguised as a manufacturing defect claim because all cigarettes contain such a residue from tobacco fumigation. *Id.* The Texas Supreme Court rejected this argument, concluding that "[a]lthough pesticide residue may be found in many, if not all cigarettes, it is not an ingredient American intended to incorporate into its cigarettes." *Id.* The court concluded that the presence

---

7. Hearsay statements are not "incompetent" evidence and, therefore, may support a judgment, whereas speculative and conclusory expert testimony will not. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 n. 1 (Tex.2004).

of pesticide residue therefore could be a manufacturing defect. *Id.*

Here, the record contains evidence that Olympic intended some inclusions to be present in the steel because the inclusions served a purpose. John Slater, Olympic's expert, explained that manufacturers deliberately add sulfur to stainless steel during the formation process to make the steel easier to machine. Without the addition of sulfur, stainless steel can be "extremely difficult" to machine, and the inclusions allow the steel to become "easily machinable." In asking for judgment notwithstanding the verdict, however, Olympic ignored McClellan's testimony regarding the correlation between the amount of sulfur and the resulting number of inclusions and the evidence suggesting that Olympic's barrel failed due to the presence of *too many* inclusions. Moreover, O'Day testified that he had witnessed another Olympic barrel fail shortly after Green's. O'Day sold that barrel around the time that he built Green's rifle. O'Day had that barrel tested, and the results of the analysis revealed that the steel in that barrel was also "full of inclusions," causing the barrel to split.

Paul Stevens, the individual responsible for quality control at Olympic, testified that he inspects less than five percent of the barrel blanks that Olympic ships to dealers. Stevens testified that he could not determine whether the barrel blank that Olympic had shipped to O'Day for Green's rifle had ever been tested or inspected. Olympic did not perform tests to determine whether inclusions existed on the interior surface of its barrel blanks. In the event that an Olympic barrel suffered a catastrophic failure and was returned to Olympic for a refund, Stevens testified that he would not be notified. McLellan testified that if he were providing Ultra Light Contour barrels to gun-

smiths whom he knew were chambering the barrels for Weatherby Magnum cartridges, he would implement an "extensive testing program," and he criticized Olympic's practice of not maintaining records of its test results on its steel beyond one year.

Viewed in a light favorable to the jury's verdict, the evidence indicates that the rifle barrel was defective because it contained too many inclusions, the inclusions contributed in part to the rifle barrel's failure, and the inclusions were a producing cause of Green's injuries. The record thus contains legally sufficient evidence to support the jury's manufacturing defect finding. *See Grinnell*, 951 S.W.2d at 434.

## B. Marketing Defect

Olympic contends that the trial court erred in denying its motion for judgment notwithstanding the verdict on Green's marketing defect claim because no evidence supports the jury's conclusion that Olympic marketed the rifle barrel blank in a defective manner.

■ In order to recover for a marketing defect, a plaintiff must establish that (1) a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knows or reasonably foresees the risk of harm at the time the product is marketed; (3) the product possesses a marketing defect; (4) the absence of the warning or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn causes the product user's injury. *Jaimes v. Fiesta Mart, Inc.*, 21 S.W.3d 301, 305–06 (Tex. App.-Houston [1st Dist.] 1999, pet. denied). Olympic contends that it had no duty to warn an expert gunsmith, like O'Day, that its .30 caliber barrel blank should not be chambered for .300 Weatherby Magnum

cartridges, *i.e.,* there is no evidence that the absence of a warning made the product unreasonably dangerous to a user like O'Day. Olympic also contends that it is entitled to judgment as a matter of law because there is no evidence that O'Day would have heeded such a warning, *i.e.,* there is no evidence that the failure to warn caused Green's injury.

### Causation and Warning

■■■ Olympic contends that Green's marketing defect claim fails because no evidence exists to prove a causal nexus between Olympic's failure to warn of the risk of rifle barrel failure and Green's injury. Olympic's rifle barrel arrived to O'Day packaged in a cardboard box and accompanied by an invoice. Olympic's counsel asked O'Day whether he had ever read the back side of the invoice, and O'Day replied, "I don't pay much attention to it." Based on this testimony, Olympic contends that O'Day did not read its invoice and thus would not have heeded any warning. Olympic further contends that O'Day presently is aware that chambering an Ultra Light Contoured barrel blank for .300 Weatherby Magnum cartridges is dangerous, but that he continues to do so, using another supplier, and that his continued practice conclusively negates any causative nexus between Olympic's failure to warn and Green's injury.

O'Day contested Olympic's view at trial. In its brief, Olympic overlooks the following testimony:

> [O'Day's Counsel] If [Olympic] would have told you that you couldn't put a magnum chamber on an ultra light taper would you have placed orders for that material?
>
> [O'Day] No, sir. I would have either found another supplier that would have said it was okay, or I wouldn't have produced them.

O'Day also testified that, before he began ordering Ultra Light Contour barrels, he contacted Olympic, informed it that he would be working with magnum calibers, and "asked if there was any problem in putting them on ultra light tapers." O'Day contends that Olympic informed him that there would be "no problem" with his proposed use of its barrels. O'Day pointed out to the jury that he returned Green's first rifle barrel to Olympic to replace it when it did not fire accurately and that Olympic did not question its length or its use with a magnum cartridge—it simply sent O'Day a replacement barrel. Thus, the parties hotly contested this issue at trial. The jury, as the finder of fact, had the opportunity to view the witnesses and to weigh their credibility. *See Eberle v. Adams,* 73 S.W.3d 322, 327 (Tex.App.-Houston [1st Dist.] 2001, pet. denied).

We conclude that the record contains more than a scintilla of evidence, and thus legally sufficient evidence, to support the jury's determination with regard to a causal nexus and thus to support its determination on this element of marketing defect. *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996) (holding that anything more than scintilla of evidence is legally sufficient to support finding).

### Common Knowledge Defense

■■■ Olympic also contends that it is entitled to judgment as a matter of law on Green's marketing defect claim because it had no duty to warn O'Day, an "expert user," of dangerous uses associated with its product; hence, no evidence exists that the failure to warn made the gun barrel unreasonably dangerous, as required to prove a marketing defect. *See Sauder Custom Fabrication, Inc. v. Boyd,* 967 S.W.2d 349, 351 (Tex.1998); *Grinnell,* 951 S.W.2d at 426. In *Grinnell,* the Texas

Supreme Court observed that common knowledge "encompasses only those things so patently obvious and so well known to the community generally, that there can be no question or dispute concerning their existence." *Grinnell*, 951 S.W.2d at 426; *see also Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex. 1991).

Olympic contends that no ordinary person trained to perform custom gunsmith work could have failed to appreciate the risk of barrel failure in (1) chambering an Ultra Light Contour barrel blank for a .300 Weatherby Magnum cartridge and (2) shortening the barrel taper to a fractional point less than a published industry standard. Olympic notes that O'Day's modifications to the Olympic barrel required extensive experience and expensive equipment, such as a reamer, a lathe, and a machine cutter. Wayne Barnett, an expert gunsmith, testified that he thought Olympic should not have had to warn O'Day not to install a .300 Weatherby Magnum chamber in a barrel with the wall thickness of the Olympic Ultra Light barrel and that "a custom gunsmith that has the experience of chambering and putting together custom-made rifles should know what wall thickness they should use and order accordingly." Barnett testified that he would not have relied on Olympic's representation, or any other manufacturer's representations re-

garding suitability when ordering a rifle barrel blank. O'Day, however, testified that he had told Olympic of his intended use for the barrel that it sold to him and, if Olympic had informed him that his proposed use of its barrel blanks was dangerous, he would have either found another supplier or not made an Ultra Light rifle chambered to fire a .300 Weatherby Magnum cartridge.

■ A manufacturer owes no duty to warn a consumer of the "obvious risks" associated with a product. *See Grinnell*, 951 S.W.2d at 426; *see also Caterpillar v. Shears*, 911 S.W.2d 379, 382 (1995). Olympic relies upon the obvious-risk line of cases to support its argument that it had no duty to warn O'Day and, therefore, had no duty to Green. The cited cases, however, involve obvious risks apparent to the average user. In *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 464 (5th Cir.1976), for example, the Fifth Circuit Court of Appeals determined that the injured plaintiff was actually aware of the nature of the dangers associated with that product.[8] Likewise, in *Boyd*, 967 S.W.2d at 351, the Texas Supreme Court concluded that the obviousness of a risk must be determined from the perspective of an average person or an "average user" of a product. Here, there is no evidence from which to conclude, *as a matter of law*, that an expert gunsmith, let alone an average person, would have recognized that Olympic's Ul-

---

**8.** Martinez was overcome by toxic fumes while cleaning the interior tanks of a barge that contained Hytrol–D, a toxic liquid mixture with a large concentration of benzene. *Martinez*, 529 F.2d at 460–61. Martinez's autopsy revealed that his death was caused by acute benzene intoxication and that similar toxic chemicals were present in his body that may have contributed to his death. *Id.* at 461. In evaluating whether there existed a duty to warn, the Fifth Circuit Court of Appeals observed: (1) the manufacturer did not contemplate that Hytrol–D would be sold or used by the general public because it was used only in the manufacture of gasoline; (2) Hytrol–D's toxicity is primarily derived from benzene, a product whose dangers are "generally appreciated" by maritime workers like Martinez; and (3) Martinez and his fellow workers were "experienced professionals" who shared "widespread awareness of the hazards of handling this type of product." *Id.* at 463. "Martinez himself was a professional with at least eight years of experience with [his employer] in shore tank cleaning." *Id.*

tra Light Contour rifle barrel blank was not suitable for some types of rifle cartridges. Rather, Olympic's expert conceded that he knew that gun assemblers similar to O'Day shortened the throats in gun barrels in order to make a more accurate rifle. Moreover, he agreed that Olympic's barrel *requires* a gunsmith to machine it and to shorten it to a degree within a fractional inch of the amount to which O'Day shortened it. O'Day testified that he, as an ordinary user of Olympic's barrel, was unaware of the danger presented by its product. O'Day further testified that he expected Olympic to have the expertise and knowledge to determine what kind of steel should be used in its .30 caliber Ultra Light Contour barrel blanks.

■ In some instances, a manufacturer or supplier may depend on an intermediary to communicate a warning to the ultimate user of a product. *Firestone Tire & Rubber Co. v. Battle*, 745 S.W.2d 909, 914 (Tex.App.-Houston [1st Dist.] 1988, writ denied). A manufacturer is not, however, relieved of its duty to warn those whom it reasonably should expect to be endangered by the use of its product solely due to the presence of an intermediary. *Id.* The parties presented conflicting evidence on the adequacy of O'Day's expertise so as to relieve Olympic of its duty to warn. We therefore hold that Olympic did not establish its "common knowledge" defense as to O'Day as a matter of law and that more than a scintilla of evidence exists to support the jury's determination on marketing defect. Olympic therefore is not entitled to rendition of judgment on this cause of action.

## C. Breach of Warranty

■ Olympic contends that no evidence supports the jury's verdict on Green's warranty claims. The jury found that Olympic breached its implied warranties of fitness for a particular purpose.[9]

Olympic contends that Green's claim for breach of the implied warranty of fitness for a particular purpose fails because (1) the record contains no evidence that Olympic had reason to know of any particular purpose for which its goods were required, beyond the ordinary purpose for which its rifle blanks are sold, and (2) no evidence exists that Olympic had reason to know that O'Day relied upon Olympic's skill or judgment in selecting suitable goods. Olympic relies on Comment two to section 2.315 of the Texas Business and Commerce Code.[10] Section 2.315 defines an implied warranty of fitness for a particular purpose as:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next sec-

---

9. At the outset, Olympic contends that the evidence negates a manufacturing defect as to Olympic's rifle barrel and thus Olympic did not breach any warranty. We have already determined that legally sufficient evidence supports the jury's finding of a manufacturing defect; thus, this contention does not defeat Green's warranty claims.

10. Comment two of section 2.315 provides:
The provisions of this Article on the cumulation and conflict of express and implied warranties must be considered on the ques-

tion of inconsistency between or among warranties. In such a case any question of fact as to which warranty was intended by the parties to apply must be resolved in favor of the warranty of fitness for particular purpose as against all other warranties except where the buyer has taken upon himself the responsibility of furnishing the technical specifications.

TEX. BUS. & COM.CODE ANN. § 2.315 cmt. 2 (Vernon 1994).

tion an implied warranty that the goods shall be fit for such purpose.

TEX. BUS. & COM.CODE ANN. § 2.315 (Vernon 1994).

Olympic contends that O'Day furnished "technical specifications" for the rifle barrel—specifically, he ordered a broach cut .30 caliber National Match barrel blank with a 1–in–10 rifle twist and ultra light tapers—thereby precluding the application of any implied warranty of fitness for a particular purpose. It does not follow from the comment to section 2.315 of the Texas Uniform Commercial Code, however, that no warranty of fitness for a particular purpose exists if a plaintiff has ordered according to specifications; rather, in such circumstances, comment two notes that a warranty of fitness may not be the dominant warranty, given other inconsistent warranties.

Here, Green does not contend that Olympic's barrel blank failed to conform to O'Day's technical specifications, which did not extend to the type of steel to be used. Instead, Green contends that Olympic used defective steel for the rifle barrel it sold—steel with too many inclusions and microcracks for an Ultra Light Contour barrel—making the gun unfit for the particular purpose for which it was designed. Olympic chose the steel that it used to make the rifle barrel. Schuetz testified that "I myself personally order all the barrel steel that we need, because I watch this very closely." He fills out purchase orders that specify the diameter and grade of the steel and that it should be "rifle barrel quality."

Olympic sells its custom rifle barrels to gunsmiths through a catalog. Schuetz testified that the catalog "explains the custom barrels that we make for the sale to the gunsmiths and explains what material is there, what the twists are and what material we use, what the contours are." O'Day ordered Green's rifle barrel according to specifications set forth in Olympic's catalog. The record also contains evidence that Olympic knew that O'Day intended to use its barrel blanks in magnum calibers and that Olympic informed O'Day that putting them on its ultra light tapers presented no problems.[11]

The fact that O'Day contacted Olympic and Olympic informed him that there would be no problem with the proposed use of Olympic's barrel blanks supports the jury's finding that Olympic had knowledge of the fact that O'Day relied on its representations. See TEX. BUS. & COM.CODE ANN. § 2.315 (providing that, if seller at time of contracting has reason to know (1) of particular purpose for which goods required and (2) that buyer is relying upon seller's skill and judgment to furnish suitable goods, law implies warranty that goods shall be fit for such purpose, unless warranty properly excluded).

Moreover, the first comment of Section 2.315 provides:

Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buy-

11. Olympic responds that O'Day asked about magnum .300 *Winchester* rifles and not .300 *Weatherby* rifles. O'Day testified that Olym-pic knew he used its rifle barrels for both kinds of cartridges.

er, of course, must actually be relying on the seller.

TEX. BUS. & COM.CODE ANN. § 2.315 cmt. 1.

The evidence presented at trial raises a fact issue as to whether Olympic breached its implied warranty, and the trial court correctly submitted a question to the jury on this issue. We conclude that legally sufficient evidence exists to support the jury's finding. Olympic therefore has not established that it is entitled to rendition of judgment on O'Day's cause of action for breach of the implied warranty of fitness.

**D. Negligence**

Olympic contends that Green's negligence action is barred as a matter of law because no evidence supports Green's manufacturing and marketing defect claims. For example, if no duty to warn exists, a similarly framed negligence action is barred as a matter of law. *See McGuire*, 814 S.W.2d at 387–88 (holding that no duty to warn of open and obvious danger of alcoholism from continuous consumption of alcoholic beverages also bars negligence claim). Olympic raises no other argument on appeal with regard to the jury's finding on Green's negligence claim. We have already determined that legally sufficient evidence exists to support Green's manufacturing and marketing defect claims; therefore, Olympic's dependent contention that Green's negligence claim fails as a matter of law is without merit.

**V. The Admissibility of Expert Testimony**

Several of Olympic's legal sufficiency points include complaints as to the admissibility of expert testimony. Olympic con-

tends that the evidence supporting Green's causes of action is legally insufficient without this improperly admitted testimony. We thus address Olympic's complaints about Green's experts, to the extent they relate to its legal sufficiency complaints.

Olympic contends that the trial court abused its discretion in permitting Rex McLellan, John Butters, and Kerry O'Day to testify at trial regarding metallurgical issues (McLellan) and causation (Butters and O'Day).[12] McLellan opined that Olympic's steel was inappropriate for high pressure rifle applications. Butters testified that Olympic manufactured its rifle barrel from "dirty" and defective steel that could not withstand the pressure generated inside the rifle barrel. O'Day also testified that the Olympic rifle barrel was composed of defective steel and it was the defective steel, not his work on the barrel, that caused the barrel to fail.

**A. Standard of Review**

We review the trial court's decision to admit expert testimony for abuse of discretion. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995). This court will overturn a trial court's decision to admit such evidence upon a finding that the trial court's ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex.2000) In determining whether to admit particular expert opinions, trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill v. Jack Williams Chevrolet, Inc.*,

12. Olympic also complains about the expert testimony offered by Robert Fumagalli regarding Green's economic damages. Because we reverse this case for jury charge error on the comparative responsibility issue, we need not reach the admissibility of Fumagalli's testimony on damages.

972 S.W.2d 713, 719 (Tex.1998). Moreover, a trial court must evaluate the methods, analysis, and principles upon which an expert relies in reaching an opinion, to ensure that the opinion given comports with applicable professional standards outside the courtroom and that it has a reliable basis in the knowledge and experience of the discipline. Tex.R. Evid. 702; *Gammill*, 972 S.W.2d at 725–26.

In a complaint regarding the reliability of expert testimony, a party must present it to the trial court, or appellate review is waived. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex.1998). No objection is required, however, to preserve a no-evidence challenge to conclusory expert testimony. *Coastal Transport Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex.2004) (holding that objection is required if challenging underlying methodology, technique, or foundational data supporting expert testimony, unless testimony is wholly speculative or conclusive).

### B. Brian McLellan

Olympic contends that McLellan's causation opinions are unreliable. In its brief, however, Olympic acknowledges that it does not impugn McLellan's "metallurgical expertise." Olympic instead contends that McLellan is not qualified to give expert testimony on "gunsmithing issues."

McLellan holds a Ph.D. in metallurgy and is a Professor of Material Science at Rice University. He performs failure analyses on metals. McLellan has taught and reviewed industrial failures in metals for 35 years and has accrued "long experience close up in looking at defects in metallic components and figuring out what caused them and how you can possibly avoid them." McLellan testified that literature in his field observes that manganese and sulfide inclusions in too great an amount contribute to shotgun barrel explosions. If a high number of inclusions are present in a gun barrel, and the metal is subjected to high stresses, the inclusions will grow until one reaches a critical size and causes the rifle barrel to fail.

McLellan performed tests on Green's barrel and opined that the barrel failed because of the interaction of three variables. First, Olympic intentionally made the "raw thickness" of the rifle barrel relatively small to reduce its weight. Second, O'Day used a cartridge for the rifle barrel that creates high pressure when fired. Third, the Olympic barrel steel was full of inclusions and microcracks, which became larger each time the rifle was fired, until the largest crack caused the barrel to disintegrate. The inclusions present in Olympic's steel barrel were a problem because Olympic used thin walls in constructing its barrel. McClellan testified that, had the Ultra Light Contour barrel contained no inclusions, "calculations show you that even for this powerful round, this wall thickness would amply take care of it."

Olympic contends on appeal that McLellan's metallurgical opinions were "conclusively gutted" because at trial, he retracted the "mistaken impression" in his initial expert report that the steel contained too much sulfur. McLellan's error arose because of a misprint in the American Society of Metals handbook. McLellan acknowledged his error at trial, agreeing that the Olympic barrel did not contain 10 times the amount of sulfur that 416 steel should contain. He noted, however, that "the point of mentioning the high sulfur content in my report is because that is what ultimately caused the problem with the rifle, not the misprint in the ASM book." Olympic's counsel also challenged McLellan's conclusion that the barrel "may not be 416 steel because of a discrepancy in the manganese content" by demonstrat-

ing that 416 steel has a maximum manganese content of 1.25, and that "if the subject barrel had manganese of 0.49, that's within ... the maximum noted of 1.25." McLellan acknowledged this statement as correct. McLellan persisted in his opinion, however, that, based on his tests, the barrel's high number of inclusions ultimately caused the rifle to fail. Olympic did not dispute that the rifle barrel contained a number of inclusions.

Olympic agrees that McLellan possesses "unimpugned" qualifications to testify to issues requiring metallurgical expertise, but contends that he lacks qualifications to testify that "416 steel is inappropriate for high-pressure rifle applications" because this opinion pertains to gun design, and McLellan is not qualified to offer opinions on gun design. McLellan explained, however, that he has considerable experience through his training in metallurgy "since quality control is an important and intrinsic part of manufacturing with metals." McLellan also explained that he has modified and repaired guns for 35 years, described himself as an "amateur gunsmith," and stated that, during that time, he has gained a "good modicum" of knowledge regarding firearms. Olympic's metallurgical expert, John Slater, did not contest McLellan's qualifications for rendering the opinions he presented. Instead, Slater replied that "Dr. McLellan has the academic background to do the work that he does."

We conclude that the trial court did not abuse its discretion in determining that McLellan's testimony was reliable and therefore admissible. Although Olympic exposed some weaknesses in his opinions, *Robinson* provides that the jury is to assess the weight and credibility of an expert's proffered testimony. *Robinson*, 923 S.W.2d at 558; *see also Gammill*, 972 S.W.2d at 728 (providing that cross-examination is "the traditional and appropriate means of attacking shaky but admissible evidence").

■■■ Olympic further contends that Green did not timely disclose McLellan's testimony that "416 steel is inappropriate for high-pressure rifle applications" and, therefore, the testimony should have been excluded. McLellan testified that the opinions contained in his supplemental report were based, in part, on the eve-of-trial deposition testimony of Schuetz. The trial court asked Green's counsel to justify the timing of his expert's supplemental report. Green's counsel responded that in Schuetz's deposition, taken fewer than four weeks before trial, he identified Paul Stevens, for the first time, as the individual responsible for quality control at Olympic. McLellan thus could not supplement his report within the discovery period because Olympic had not identified Stevens before then. Olympic did not urge the untimeliness of McLellan's "new opinion" as a basis for a motion for continuance and did not seek an additional opportunity to depose McLellan. The trial court overruled Olympic's motion to exclude. Given the timing of events, we conclude that the trial court did not abuse its discretion in overruling Olympic's motion to exclude McLellan's testimony based upon the untimeliness of McLellan's supplementation. *See K-Mart Corp.*, 24 S.W.3d at 360.

## C. John Butters

■■■ Butters, a mechanical engineer, testified that he examined Green's Olympic barrel and determined that it did not fail because of the presence of an obstruction in the barrel, and the barrel split nine inches from the chamber. He compared the cartridges fired in Green's rifle before the barrel failed to the shape of a cartridge fired from a properly chambered .300 Weatherby Magnum rifle. He determined that no defect existed due to the

"machining" of the chamber. Butters testified that, if the chamber had been designed improperly with a "throat" cut too short, then physical evidence of excessive pressure would be present in the chamber. Butters testified that, if the gun had exploded due to excessive pressure, the printing on the "case head" would be smeared, the primer would be flattened, and there could be an indication that gas had leaked from around the primer. No such signs of excessive pressure were present in Green's rifle. Butters testified that the rifle was made with defective steel, and he was "absolutely confident" that the barrel's thickness was sufficient to support the amount of pressure generated after Green fired the cartridge.

Olympic concedes that Butters is qualified to testify about engineering issues, but contends that Butters is not a metallurgist and should not have testified about the quality of the steel. Butters testified, however, that the barrel did not fail due to excessive pressure and that the thickness of the barrel was sufficient-opinions based upon his engineering expertise. We hold that the trial court did not abuse its discretion in admitting this testimony.

Olympic correctly points out that Butters should not have testified that the steel was defective. Green testified without objection, however, that he was informed by an EFI employee that EFI had tested the Olympic barrel and that the test had revealed that "this gun barrel was full of inclusions and this thing should have never been used on a rifle barrel. This is the type of steel that you would find ... in a file cabinet." O'Day also testified, without objection, that the barrel was made from steel that did not meet the requirements of 416 steel. Finally, McClellan, whom Olympic concedes has expertise in the matter, testified that the steel was defective. Olympic thus has not demonstrated how Butters's testimony about the steel, even if improperly admitted, caused the rendition of an improper judgment, because it is cumulative of other testimony. *Mancorp, Inc., v. Culpepper,* 802 S.W.2d 226, 230 (Tex.1990) ("When erroneously admitted evidence is merely cumulative or does not concern a material issue dispositive of the case, the error is harmless."); *Badger v. Symon,* 661 S.W.2d 163, 164 (Tex.App.-Houston [1st Dist.] 1983, writ ref'd n.r.e.).

### D. Kerry O'Day

■ Olympic complains of the following two instances at trial in which co-defendant O'Day opined that defective steel caused the rifle barrel to fail. O'Day testified before the jury, without objection, as follows:

[O'Day's Counsel]: Did you—did you hear where Mr. Schuetz [Olympic's owner] said that you should not be putting .300 Weatherby Magnum chambers on these .30 caliber barrel blanks?

[O'Day]: Yes, sir, I heard that in the deposition.

[O'Day's Counsel]: Now, you have already told us that you know they knew that. But in your opinion, could you put .300 Weatherby Magnum chambers on these .30 caliber barrel blanks, had they been made with adequate steel?

[O'Day]: Oh, yes, sir. I have been doing it for many many years.

Later during O'Day's examination, the following exchange occurred without objection:

[O'Day's Counsel]: Kerry, do you feel bad about this accident?

[O'Day]: Yes, sir, I do.

[O'Day's Counsel]: Do you feel like you are responsible for this?

[O'Day]: No, sir, I don't.

[O'Day's Counsel]: Why not?

[O'Day]: If we would have had good steel in those barrels, none of us would be here right now.

Before trial, the trial court granted Olympic's motion to exclude opinion testimony from O'Day regarding metallurgical issues. O'Day also repeatedly testified at trial that he was not a metallurgist. Green observes, however, that Olympic waived its complaints regarding O'Day because Olympic elicited testimony to the same effect from O'Day. The following exchange took place before the jury:

[Olympic's Counsel]: Now, in your deposition, you told me that it was your position that the steel in that rifle barrel did not meet the requirements for 416 steel. Do you recall that testimony?

[O'Day]: Again, you should probably talk to a metallurgist about it; but I don't believe it meets the requirements for quality steel.

[Olympic's Counsel]: All right. Now, what you told me in your deposition was this, "My opinion is the steel given to Olympic Arms was probably not of a 416R or 416F manufacture." Does that sound accurate?

[O'Day]: Yes, sir.

[Olympic's Counsel]: Okay. Because had it been 416 stainless steel it would have been fine, right?

[O'Day]: If it would have been quality 416 steel, without the inclusions, it would have been fine.

▮ Admission of improper testimony is waived if testimony to the same effect has been permitted without objection. *Symon*, 661 S.W.2d at 164. Even if a trial court erroneously admits evidence over objection, the error is harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Id.* at 164–65. Olympic introduced the same or similar evidence, and thus we hold that the admission of O'Day's testimony, if error, was harmless. *Id.*

## VI. Olympic's Defensive Theories

### A. Substantial Alteration

▮ Olympic contends that O'Day substantially altered its rifle barrel in an unforeseeable manner, and therefore we should render judgment, as a matter of law, on each of Green's products liability claims. Specifically, Olympic contends that O'Day modified its rifle barrel by shortening the chamber end or "shank" of the rifle too much, pushing the chamber forward into the barrel's "taper." Green responds that Olympic concedes that it sells its Ultra Light Contour rifle barrel with the intent that gunsmiths, like O'Day, shorten it to fit the cartridges it fires. Thus, Green contends, O'Day's alteration of Olympic's barrel was reasonably foreseeable to Olympic, and the evidence is legally sufficient to support the jury's determination of Olympic's liability on Green's product defect claims.

▮ Substantial alteration of a product is a type of product misuse and an affirmative defense for which the defendant bears the burden of proof. *Placencio v. Allied Indus. Intern., Inc.*, 724 S.W.2d 20, 22 (Tex.1987). "Alterations or modifications not reasonably foreseeable by the manufacturer or seller are sufficient to preclude imposition of liability." *USX Corp. v. Salinas*, 818 S.W.2d 473, 489 n. 16 (Tex.App.-San Antonio 1991, writ denied). We therefore determine whether Olympic has proved its substantial alteration defense as a matter of law.

### Foreseeable Use

At the time of the accident, O'Day had purchased rifle barrels from Olympic for approximately 17 years. He spoke with Olympic regarding the barrels that he ordered and their possible uses. Before O'Day began to work with Ultra Light Contour barrels, he telephoned Olympic and asked whether Olympic had any problem with his using magnum cartridges on its ultra light tapers. Olympic assured O'Day that there would be "no problem" with this use of its rifle barrel. O'Day testified that, had Olympic informed O'Day that chambering its Ultra Light Contour barrels for use with magnum calibers was hazardous, he would have found another supplier who made rifle barrels that work with magnum cartridges or not produced this particular rifle. O'Day further testified that Olympic was aware that he was chambering its Ultra Light Contour barrels for use with magnum caliber bullets.

In order for Olympic's product to be put to its intended use, a gunsmith must incorporate Olympic's rifle barrel into a rifle. Olympic admitted that its barrel blanks "cannot be used for anything until Olympic's customer ... chambers the blank for the ammunition intended for the custom rifle and fits the barrel to the action of the custom rifle." The gunsmith must thread the barrel so that it can be screwed into the receiver on the rifle and then must "ream" or cut the chamber from the inside of the barrel. A gunsmith then cuts a recess or "bolt cut" into the barrel, so that the bolt can turn in the recess when rounds are inserted into or ejected from the chamber. Olympic acknowledged that gunsmiths make these alterations, but contends that O'Day made them improperly.

In particular, Olympic presented evidence that O'Day's modifications deviated from recommendations promulgated by the Sporting Arms & Ammunition Manu-facturing Institute ("SAAMI"). For example, in its brief, Olympic admits that O'Day was required to decrease the shank of the barrel blank it sold to O'Day by 0.50 inches in order to thread the barrel blank to the rifle's action. According to Olympic, however, O'Day decreased it by 0.925 inches. Similarly, when O'Day chambered the barrel blank, he reduced the "throat dimension" to 0.136 inches, whereas SAAMI recommends 0.361 inches as the minimum throat dimension. Olympic acknowledged that the SAAMI recommendations are voluntary.

O'Day denied that his alterations amounted to a misuse of the product and testified that the shortened barrel improved accuracy. He also testified that Olympic knew the degree to which he modified its barrels because if an Olympic barrel on a customer's rifle was inaccurate, he returned the inaccurate barrel to Olympic. These returned barrels had been chambered and installed onto working rifles and thus alerted Olympic as to the types of chambers and calibers that O'Day installed on its barrel blanks, including .300 Weatherby Magnum cartridges. Thus, the jury heard conflicting evidence about whether O'Day shortened the barrel to a degree to which Olympic did not approve. The jury concluded that Olympic was 50% responsible for the barrel explosion.

Although the jury heard contrary evidence on the matter, we find that legally sufficient evidence exists to support its finding that Olympic foresaw, or should have foreseen O'Day's modifications. Therefore, we hold that Olympic has failed to prove its substantial alteration defense as a matter of law on the basis of the unforseeability of O'Day's modifications.

### Multiple Parties Worked on the Rifle

Alternatively, relying on *Trevino v. Yamaha Motor Corp.,* 882 F.2d 182, 185

(5th Cir.1989), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n. 14 (5th Cir.1994), Olympic contends that we should render judgment in its favor because O'Day is solely responsible for the alterations performed on its barrel. A manufacturer of a component part is not liable for defects in the final product if it does not participate in the integration of the component into the final product and the component is not itself defective. *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 683 (Tex.2004). In *Trevino*, the Fifth Circuit Court of Appeals, relying on *Elliott v. Century Chevrolet Co.*, 597 S.W.2d 563, 564 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.), examined three factors to determine responsibility for a defective product if the finished product is the result of substantial work by multiple parties: (1) trade custom—at what stage would the defect normally be cured; (2) relative expertise—which party is best acquainted with the design problems of the product as modified; and (3) practical considerations—which party is in the better position to remedy or warn of the defect. *Trevino*, 882 F.2d at 185.

The evidence at trial included testimony that Olympic was aware that the gunsmiths to whom it sells had to remove steel from the rifle barrel blanks that it manufacturers and sells, and that, if too much steel is removed, then its product may fail. Olympic, moreover, acknowledged at trial that it is acquainted with the tolerances for

stress of its product *as modified.* Finally, O'Day had returned Green's first rifle—one already machined—to Olympic, which replaced it. Green presented evidence that Olympic knew and could warn of this potential hazard. In this instance, Olympic's duty to warn is commensurate with its knowledge of the intended use of its product. *See Wood v. Phillips Petroleum Co.*, 119 S.W.3d 870, 873–74 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Relying on *Trevino*, Olympic further contends that, although Green presented evidence that the barrel's steel was full of inclusions and imperfections, causing it to fail, we must assume that the inclusions in the barrel did not cause it to fail and that O'Day's work solely caused it to fail. Given our standard of review, however, which requires that we view facts in a light favorable to the jury's verdict, we hold that Olympic failed to prove, as a matter of law, that it was the rifle barrel's modification that caused it to fail. *See Bostrom*, 140 S.W.3d at 684.[13] Green's experts testified that it did not. We hold that legally sufficient evidence supports Green's claim that Olympic reasonably could foresee that a gunsmith, such as O'Day, would order the Ultra Light Contour barrel blank and perform the work that O'Day performed on the barrel to construct a custom rifle. Olympic thus fails to demonstrate that the trial court should have rendered judgment for it, as a matter of law, based upon its substantial alteration defense.[14]

---

**13.** In *Bostrom*, the Texas Supreme Court held that a component part manufacturer cannot be held strictly liable for defects arising from the integration of the component into the finished product, absent evidence that the component itself is defective. 140 S.W.3d at 683. In this case, Green presented legally sufficient evidence that the rifle barrel component that Olympic supplied to O'Day was defective and thus Olympic, as the manufacturer of the defective part, is not absolved of liability as a matter of law. *See id.*

**14.** Olympic also contends that the trial court erred in refusing to instruct the jury separately as to Olympic's substantial alteration defense. Olympic objected to the court's charge and tendered the instruction pertaining to substantial alteration contained in the Texas Pattern Jury Charge on each of the product liability questions. *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS PJC 70.5 (2002). We have reversed the judgment and remanded this cause on the trial court's

## B. Sole Cause

Olympic further contends that O'Day's conduct was the sole producing cause of Green's injuries and that we thus should render judgment for Olympic as a matter of law. Olympic contends that the evidence conclusively negates proximate cause because no manufacturing defect existed and O'Day did not need, did not read, and would not heed any warning about the proper use of Olympic's product. As discussed above, we reject Olympic's contention that the evidence is legally insufficient to support the jury's findings that a causal nexus exists. In addition, Olympic contends that the trial court erred in refusing to give an instruction regarding a "sole cause" defense. Because we have reversed the judgment and remanded the cause on Olympic's comparative responsibility issue, we do not address Olympic's sole cause issue.

## VII. Conclusion

Olympic timely requested that the trial court include its settling co-defendants in the jury charge for the jury to assess responsibility for Green's injuries. The trial court refused Olympic's request. Chapter 33 of the Civil Practice and Remedies Code requires such a submission if the evidence raises an issue as to a settling party's responsibility. We conclude that the evidence raised such an issue and therefore hold that the trial court erred in refusing to submit the settling parties for comparative causation. We further hold that the omission is not harmless because

---

it precluded the jury from considering whether the settling defendants' conduct contributed to Green's injuries. Finally, we hold that legally sufficient evidence supports Green's claims and that Olympic did not conclusively prove its defensive theories, so as to be entitled to a rendition of judgment. We therefore reverse the trial court's judgment and remand the cause for a new trial.[15]

---

failure to include the settling defendants in the comparative responsibility issue. We therefore need not address Olympic's complaint that the trial court erred in refusing to submit a substantial alteration defense.

15. Olympic contends that the trial court abused its discretion in refusing to allow it to question O'Day regarding the fact that he continues to manufacture Ultra Light Contour rifles. Olympic also contends that it is entitled to reimbursement of its attorney's fees. In his own appeal, Green contends that the trial court erred in its calculation of pre-judgment interest. Because we have reversed the judgment and remanded the cause for a new trial, we need not address these issues.