

# IN THE
# TENTH COURT OF APPEALS

### No. 10-06-00256-CV

**MCI SALES AND SERVICE, INC.,
F/K/A HAUSMAN BUS SALES, INC.,
AND MOTOR COACH INDUSTRIES
MEXICO, S.A. DE C.V., F/K/A
DINA AUTOBUSES, S.A. DE C.V.,**

**Appellants**

**v.**

**JAMES HINTON, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE
OF DOLORES HINTON, DECEASED, ET AL.,**

**Appellees**

**From the 170th District Court
McLennan County, Texas
Trial Court No. 2003-2308-4**

## OPINION

The appeal of this products liability case primarily raises issues of federal preemption, legal sufficiency of the evidence, and proportionate responsibility. Finding that the trial court abused its discretion by not asking the jury to find the bus driver's or his employer's proportionate responsibility as settling parties, we will reverse and

remand.

## I.  Background

This "crashworthiness" case arises from an accident involving a "motor coach" passenger bus near Waco on February 14, 2003.  The passengers had boarded a bus chartered by Central Texas Trails and driven by Johnny Cummings to take them from Temple to Dallas.  As the bus headed north on Interstate 35 (I-35), the weather conditions were overcast with reduced visibility due to fog, haze, and heavy rain.  As the bus crested a hill just south of Waco, Cummings saw cars stopped ahead because a prior accident had caused northbound I-35 to be shut down.  Instead of trying to stop in time to avoid hitting the stopped traffic ahead, Cummings steered to the left and drove the bus across the earthen median into the southbound lanes of I-35.  The bus slammed head-on into a large SUV, instantly killing two of its occupants.  The impact caused the bus to spin counterclockwise, tip over on its right side, and slide to a stop over the ditch between southbound I-35 and the west access road.  Five passengers on the bus were killed, and many were injured.

The bus occupants and their relatives—many of whom are the Plaintiffs below and the Appellees here—made claims against the bankruptcy estates of the bus owner—Central Texas Trails, Inc., Central Texas Bus Lines, Inc., and Kincannon Enterprises (collectively Central Texas)—and Cummings, a Central Texas employee. The liability insurance carrier for Central Texas and Cummings paid its $5 million in policy limits into the registry of the bankruptcy court to be held and distributed among those who had asserted claims against Central Texas and Cummings in accordance with

the bankruptcy court's "Apportionment Plan" and "Litigation Plan."

The Plaintiffs then sued MCI Sales and Service Inc. and Motor Coach Industries Mexico, S.A. de C.V. (MCI), alleging that the bus was defectively designed and unreasonably dangerous because it was not equipped with three-point passenger seatbelts or with laminated glass passenger windows.[1]  The case went to trial against only MCI, which had imported, assembled, and sold the bus to Central Texas.  The trial court rejected MCI's attempts to join Central Texas and Cummings as responsible third parties and also refused to submit a question to the jury asking if they were liable as responsible third parties or settling parties for a proportionate liability determination.  A jury found MCI liable and awarded approximately $17 million in damages to the Plaintiffs.

After the trial but before the final judgment was signed, and under the bankruptcy court's Litigation Plan, a special judge conducted a private hearing in which Cummings was found negligent and findings were made allocating the insurance proceeds among the claimants.  After the bankruptcy court approved the findings, MCI moved the state trial court for settlement credits for the sums paid to the Plaintiffs from the bankruptcy proceeding.  Rather than crediting MCI for those sums, the trial court entered a final judgment totaling just over $17 million but reciting that it has been

---

[1]     MCI joined Marcopolo, S.A., a Brazilian company that manufactured component parts of the bus, as a responsible third party, and also filed a third-party action against Marcopolo.  Marcopolo made a special appearance, which the trial court sustained, and it severed MCI's third-party action against Marcopolo.  In MCI's appeal of the special appearance ruling, we affirmed the trial court's decision. *See Motor Coach Indus., Inc. v. Marcopolo, S.A.,* 2007 WL 4157241 (Tex. App.—Waco Nov. 21, 2007, no pet.). MCI's eighth issue contends that, if the trial court erred by granting Marcopolo's special appearance, its severance of MCI's third-party action against Marcopolo would have been erroneous and the judgment should be reversed.  Because we affirmed the trial court's decision on Marcopolo's special appearance, we overrule MCI's eighth issue.

"partially satisfied" as to each Plaintiff in the exact amount each received on their claims in the bankruptcy proceeding. MCI appeals, raising eight issues.

## II. Federal Preemption

We begin with MCI's third issue, which asserts that the Plaintiffs' state common-law defective design claims regarding seatbelts and laminated windows are impliedly preempted by federal law. The jury found that there was a design defect in the bus at the time it left MCI's possession because it did not have passenger safety belts and because laminated glass was not used in the side passenger windows.

> The laws of the United States are the "supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. If a state law conflicts with federal law, it is preempted and has no effect. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). A federal law may expressly preempt state law. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Additionally, federal law or regulations may impliedly preempt state law or regulations if the statute's scope indicates that Congress intended federal law or regulations to occupy the field exclusively or if state law actually conflicts with federal law or regulations. *Myrick,* 514 U.S. at 287, 115 S.Ct. 1483; *Moore v. Brunswick Bowling & Billiards Corp.,* 889 S.W.2d 246, 247-48 (Tex. 1994). State law presents an actual conflict with federal law when: (1) it is impossible for a private party to comply with both state and federal requirements; or (2) state law obstructs accomplishing and executing Congress' full purposes and objectives. *See Myrick,* 514 U.S. at 287, 115 S.Ct. 1483 (citing *English,* 496 U.S. at 79, 110 S.Ct. 2270 and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

> The United States Supreme Court limits the preemption doctrine by presuming that Congress did not intend to displace state law. *See Maryland,* 451 U.S. at 746, 101 S.Ct. 2114; *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Historically, states have exercised primary authority in matters involving their citizens' public health and safety. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Thus, this presumption is nowhere stronger than under circumstances in which the states are exercising that authority. *See*

*Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 718-19, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Common-law actions based upon negligence and products liability involve the state's power to regulate health and safety matters. *See Moore,* 889 S.W.2d at 249. Accordingly, the party urging preemption has the difficult burden of overcoming the presumption against preemption. *See Silkwood v. Kerr McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (stating that the party urging preemption has the burden of proof).

*Great Dane Trailers, Inc. v. Estate of Wells,* 52 S.W.3d 737, 743 (Tex. 2001); *see also Sprietsma v. Mercury Marine,* 537 U.S. 51, 64-65, 123 S.Ct. 518, 527, 154 L.Ed.2d 466 (2002); *Turoff v. McCaslin,* 222 S.W.3d 664, 668 (Tex. App.—Waco 2007, no pet.).

MCI argues that the seatbelt and laminated-window design defect claims are impliedly preempted because they conflict with federal motor vehicle regulations. The Texas Supreme Court has on at least two occasions summarized the history of the National Traffic and Motor Vehicle Safety Act, the statutory source for those regulations. *See Great Dane,* 52 S.W.3d at 742; *Hyundai Motor Co. v. Alvarado,* 974 S.W.2d 1, 3-4 (Tex. 1998). We quote from *Great Dane*:

> In 1966, Congress enacted the Safety Act, implemented under the National Highway Traffic Safety Administration's authority. The Safety Act's explicit purpose is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (recodified at 49 U.S.C. § 30101). To accomplish this purpose, Congress empowered the Secretary of Transportation to adopt motor vehicle safety standards. 15 U.S.C. § 1392(a) (recodified at 49 U.S.C. § 30111(a)). These standards must be "reasonable, practicable and appropriate." *See* 15 U.S.C. § 1392(f)(3) (recodified at 49 U.S.C. § 30111(b)(3)). Additionally, the standards must meet the need for motor vehicle safety and be stated in objective terms. *See* 15 U.S.C. § 1392(a) (recodified at 49 U.S.C. § 30111(a)). The standards the Secretary adopts under the Safety Act are, fundamentally, performance requirements, not design requirements. *See Perry v. Mercedes Benz, Inc.,* 957 F.2d 1257, 1260 (5th Cir. 1992). In fact, the Safety Act's legislative history states:

[T]he new and revised standards are expected to be performance standards, specifying the required minimum safe performance of vehicles but not the manner in which the manufacturer is to achieve the specified performance. . . . The Secretary would thus be concerned with the measurable performance of a . . . system but not its design details.

S. REP. NO. 89-1301, at 4 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2712.

*Great Dane,* 52 S.W.3d at 742 (footnote omitted).

### A. Seatbelts

MCI contends that the Plaintiffs' seatbelt claims are impliedly preempted by FMVSS 208, the federal regulation applicable to safety systems for buses, and by NHTSA's rejections of a standard that would require passenger seatbelts on buses.[2] *See* 49 C.F.R. § 571.208. Rule S4.4.3.1 of FMVSS 208 requires that each bus with a gross vehicle weight rating of more than 10,000 pounds comply with the requirements of Rules S4.4.2.1 or S4.4.2.2. Both of those rules require either a "complete passenger protection system" or a "belt system," but only for the bus driver. FMVSS 208 does not require passenger seatbelts or address the specific passenger compartmentalization standards for motor coach buses. The two rules expressly mandate belt restraint for the driver *only*. The parties agree that FMVSS 208 does not require the installation of passenger seatbelts or regulate compartmentalization for passenger protection in motor coach buses. Compartmentalization is required and regulated in school buses by

---

[2]    Two Texas Supreme Court decisions have addressed the implied preemption of state common-law tort claims by federal motor vehicle safety standards:  *Hyundai Motor Co. v. Alvarado,* 974 S.W.2d 13 (Tex. 1998) (holding that the Safety Act and FMVSS 208 did not expressly or impliedly preempt a tort claim based on the manufacturer's failure to install lap belts); and *Great Dane Trailers, Inc. v. Estate of Wells,* 52 S.W.3d 737, 744-49 (Tex. 2001) (holding that the Safety Act and FMVSS 108 did not impliedly preempt common-law "conspicuity" tort based on inadequate lighting and reflectors on truck trailer).

FMVSS 222, but that standard does not apply to motor coach buses.

### 1. Compliance Impossibility

The Plaintiffs point out what MCI essentially concedes: FMVSS 208 is silent regarding motor coach passenger protection; it does not regulate seatbelts or compartmentalization for motor coach passengers. Citing the concurring testimony of Virgil Hoogestraat, MCI's Vice President of Engineering, the Plaintiffs highlight that federal regulations neither forbid nor require the installation by MCI of passenger seatbelts in its motor coach buses, and Hoogestraat admitted that MCI could install passenger seatbelts if it chose. Plainly, therefore, it would not be impossible for MCI to install passenger seatbelts and be in compliance with federal regulations. *See Sprietsma*, 537 U.S. at 64-65, 123 S.Ct. at 527 ("We have found implied conflict pre-emption where it is 'impossible for a private party to comply with both state and federal requirements,'". . .).

### 2. Frustration of Federal Purpose

MCI next contends that the Plaintiffs' seatbelt claims are impliedly preempted because NHTSA "considered and has repeatedly and expressly rejected" a federal standard that would require passenger seatbelts on "buses." In 1973, NHTSA began to study whether to enact regulations requiring seatbelts in school buses, intercity buses, and transit buses and initially proposed a standard that provided bus manufacturers with the option of installing passenger seatbelts with a warning system to signal the passenger and driver when a passenger's seatbelt was unbuckled. *See* 38 Fed. Reg. 4776 (Feb. 22, 1973); 39 Fed. Reg. 27,585 (July 30, 1974). But one year later, NHTSA withdrew

that proposed standard for intercity and transit buses, citing cost/benefit studies of the present seating performance: "Injury statistics for intercity buses indicate that seating improvement would not reduce injuries substantially. Seat belt usage surveys in intercity buses also indicate that a very low percentage of passengers would utilize seat belts if they were provided." 39 Fed. Reg. 27,585. NHTSA also expressly eliminated the option of permitting bus manufacturers to install seatbelts *on school buses*, determining that a passive system of occupant containment by the seating system (compartmentalization) or a restraining barrier offered the most reliable crash protection in a school bus. *Id.* at 27,585-86.

Next, in 1983, NHTSA denied a petition for rulemaking that would have mandated the installation of seatbelts *on school buses*. 48 Fed. Reg. 47,032 (Oct. 17, 1983). And finally, in 1992, in response to an inquiry from MCI, NHTSA's chief counsel concluded that a proposed New York statute requiring seatbelts in intercity buses appeared to be preempted by FMVSS 208. As a result of the above, MCI thus concludes that the imposition of a state common-law duty on motor coach bus manufacturers to install passenger seatbelts would obstruct or frustrate a federal purpose.

We agree with the Plaintiffs that none of NHTSA's actions present a clear indication of a conscious federal policy against passenger seatbelts in motor coach buses. Regarding the 1973 and 1974 actions, the Plaintiffs note the low percentage of general seatbelt usage then (10-15%), whereas current seatbelt usage rates exceed 80%. And as for NHTSA's 1983 denial of the petition to require seatbelts in *school buses*, it is clear that that decision was based on policy considerations unique to school buses and

child passengers, along with NHTSA's mandated compartmentalization for school buses as a passive form of passenger protection. Finally, NHTSA's chief counsel's conclusion in 1992 that the proposed New York statute requiring seatbelts in intercity buses appeared to be preempted by FMVSS 208 would implicate only the express preemption clause of the Safety Act. *See* 49 U.S.C. § 30103(b)(1). State legislation or regulation is expressly preempted unless it is identical to the federal standard. *See Geier v. American Honda Motor Co.,* 529 U.S. 861, 868, 120 S.Ct. 1913, 1918, 146 L.Ed.2d 914 (2000); *Great Dane,* 52 S.W.3d at 741.

In conclusion, the 35-year-old NHTSA decision not to require passenger seatbelts in motor coach buses and NHTSA's actions regarding school buses do not persuade us that a conscious federal policy opposes passenger seatbelts in motor coach buses. We see no expressed opposition to the installation of passenger seatbelts in motor coaches, and Carl Nash, who was a senior executive with NHTSA for eighteen years, testified that passenger seatbelts are not prohibited or even discouraged by the federal government.[3] In fact, in 1989, seven years before the MCI bus at issue was sold, MCI asked NHTSA to provide guidance on how to anchor seatbelts in an MCI motor coach. NHTSA declined to provide specific guidance, noting: "Federal law leaves the question of how any such anchorages should be designed entirely up to the judgment of the bus manufacturer." And finally, as discussed in more detail below, the absence of federal regulation or the decision not to take regulatory action is not preemptive in this case.

---

[3] While not determinative, we note that the National Transportation Safety Board, which investigates transportation accidents but has no regulatory power in the area of safety standards for motor vehicles, has repeatedly recommended passenger seatbelts for motor coaches since 1968.

*See Sprietsma,* 537 U.S. at 64-68, 123 S.Ct. at 527-29; *Freightliner Corp. v. Myrick,* 514 U.S. 280, 286-87, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995).

Because there has been no clear federal expression of opposition to the installation of passenger seatbelts in motor coaches, we cannot say that a state common-law duty in tort to install passenger seatbelts is impliedly preempted; such a duty does not frustrate or "stand as an obstacle to the accomplishment and execution" of federal purposes and objectives. Therefore, in this respect, MCI has not met the difficult burden of overcoming the presumption against preemption. *See Great Dane,* 52 S.W.3d at 743 (citing *Silkwood,* 464 U.S. at 255, 104 S.Ct. at 625).

### 3. The Geier *Approach*

Finally, relying on *Geier v. American Honda*, MCI argues that the Plaintiffs' state common-law seatbelt claims are preempted because allowing them forecloses an option or choice left open by FMVSS 208 and NHTSA's actions relating to bus-passenger safety. In *Geier*, the plaintiffs claimed that a passenger-car manufacturer, who was in compliance with the federal standard, was nonetheless liable because it did not equip a 1987 vehicle with airbags. At the relevant time in *Geier*, FMVSS 208 required car manufacturers to equip *some, but not all*, 1987 vehicles with passive restraints. The version of FMVSS 208 at that time required manufacturers to equip only 10% of their car fleet manufactured after September 1, 1987 with passive restraints, and it increased that percentage to 100% in three annual stages. The standard explained that the phased-in requirement and the variety and mix of passive-restraint devices were deliberate to allow more time for manufacturers to develop airbags and other safer

devices.  *Geier*, 529 U.S. at 878-79, 120 S.Ct. at 1924.

After reviewing the history of FMVSS 208, the Court concluded that it reflects the Transportation Secretary's policy that safety would be best promoted if manufacturers installed alternative passive-restraint systems in their cars rather than one particular system in every car.  *Id.* at 881, 120 S.Ct. at 1925.  On the other hand, the Court noted, the plaintiffs' common-law claims were based on the presumption that *all* cars had to have airbags even if they had some other passive-restraint device.  *Id.*  The common-law claims thus presented an obstacle to manufacturers using the variety and mix of passive-restraint devices (airbags, automatic seatbelts, etc.) that FMVSS 208 sought to promote and an obstacle to the gradual passive restraint phase-in that it deliberately imposed.  *Id.* at 878-82, 120 S.Ct. at 1924-26.  The Court noted that Congress and NHTSA had expressed a preference for giving car manufacturers a choice between airbags and other safety devices for the period of time in which the plaintiffs' car was manufactured.  *Id.* at 878-81, 120 S.Ct. at 1924-25.  Accordingly, the Court held that the Safety Act and FMVSS 208 impliedly preempted the plaintiffs' common-law claims because they "stood 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives."[4]  *Id.* at 881-82, 120 S.Ct. at 1925 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

MCI, attempting to come within the *Geier* framework, contends that allowing the imposition of a common-law duty to install passenger seatbelts forecloses the option of

---

[4]     The Court also construed the Safety Act's preemption clause and saving clause together, concluding that the Safety Act does not *expressly* preempt "nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard."  *Geier,* 529 U.S. at 868, 120 S.Ct. at 1918.

MCI v. Hinton                                                                                                                Page 11

using compartmentalization as the primary passenger safety system in motor coach buses. MCI postulates that federal regulations give the bus industry a choice of two systems for restraining passengers: a passive system (compartmentalization) or a forced system (seatbelt). MCI thus concludes that the trial court's judgment imposes a state common-law duty to install seatbelts and removes MCI's option to use compartmentalization, in conflict with the alleged federal regulatory scheme.

We do not see, however, a regulatory scheme for motor coach bus passenger safety remotely similar to that for airbags such that MCI's theory fits within the *Geier* template. *Cf. BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 503-09 (Tex. 2008) (applying *Geier*-type analysis in review of extensive regulatory scheme for child-resistant cigarette lighters similar to that in *Geier* and holding the design-defect claim relating to cigarette lighter was impliedly preempted). Implied conflict preemption in *Geier* was premised on the federal government's clear and deliberate policy against requiring all cars to have airbags, instead opting for a gradual phase-in using a variety of passive protection devices that carmakers could choose from. Here, and unlike the version of FMVSS 208 at issue in *Geier* (which specifically granted passive restraint design options for carmakers), there is no federal regulation that addresses passenger seatbelts in motor coach buses.[5] Nor is there a federal regulation addressing the motor coach

---

[5] And as we stated above, there has been no clear federal expression of opposition to the installation of passenger seatbelts in motor coaches. In fact, the Plaintiffs have asked us to take judicial notice on appeal of NHTSA's most recent motor coach safety paper that contradicts MCI's recitation of NHTSA's view of passenger seatbelts in motor coach buses. *See* TEX. R. EVID. 201; *Office of Pub. Util. Counsel v. P.U.C.*, 878 S.W.2d 598, 600 (Tex. 1994) (court of appeals erred in refusing to take judicial notice of published P.U.C. order) ("To be the proper subject of judicial notice, a fact must be 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' TEX. R.

compartmentalization choice that MCI claims it was entitled to choose instead of seatbelts. What does exist is a compartmentalization standard—FMVSS 222—that indisputably applies *only* to school buses. We thus reject MCI's *Geier* approach.

MCI's implied preemption argument using *Geier* is further flawed because the absence of federal regulation is not preemptive in this case. Two cases highlight that flaw. In *Freightliner v. Myrick*, the plaintiffs alleged that tractor-trailers manufactured by the defendants were defective because they lacked an antilock-braking system (ABS). *Myrick*, 514 U.S. at 282, 115 S.Ct. at 1485. FMVSS 121, the applicable standard, did not include any requirement or prohibition regarding ABS. *Id.* at 286, 115 S.Ct. at 1487. The Court held that "the absence of a federal standard cannot implicitly extinguish state common law." *Id.* at 282, 115 S.Ct. at 1485.

The Supreme Court addressed the "absence of regulation" question again in *Sprietsma v. Mercury Marine*, which involved a product liability claim that a boat engine

CIV. EVID. 201. Judicial notice is mandatory if 'requested by a party and [the court is] supplied with the necessary information.' TEX. R. CIV. EVID. 201. A court of appeals has the power to take judicial notice for the first time on appeal.").

That paper is a NHTSA document released on August 6, 2007, entitled "NHTSA's Approach to Motorcoach Safety," authored by Roger A. Saul, NHTSA's director of its Office of Crashworthiness Standards, and filed in NHTSA's Docket No. 2007-28793 ("Motorcoach Safety Plan") (available at http://www.nhtsa.dot.gov/staticfiles/DOT/NHTSA/Vehicle%20Safety/Articles/Associated%20Files/4 81217.pdf). It begins by noting its goal: "to present a comprehensive review of motorcoach safety issues and the course of action the National Highway Traffic Safety Administration will pursue to most expediently address them." *Id.* at 1. Regarding seatbelts, the paper states:

> Seat belts are another approach for potential improved motorcoach occupant protection in crashes. Installing seat belts would be the most direct method of retaining passengers within the seating compartment. . . . Seat belts could also potentially provide protection in multiple crash modes, including rollover, and prevent ejection.
>
> Both Australia and Europe require seat belts on motorcoaches. Australian Design Rule (ADR) 68 has required lap and shoulder belts since 1994. In Europe, ECE R.80 Amendment 1 has required a lap belt or a lap/shoulder belt since 1998.

*Id.* at 12-13.

The seatbelt section of the paper concludes with NHTSA's planned approach of conducting crash tests to obtain information to develop FMVSS 210-type performance requirements for the seatbelt assembly and seat anchorages. *Id.* at 14.

should have been equipped with a propeller guard. *Sprietsma*, 537 U.S. at 54, 123 S.Ct. at 522. The applicable federal regulation did not require or prohibit propeller guards. *Id.* at 65, 123 S.Ct. at 527. After recognizing that the Coast Guard had considered propeller guard regulation but decided not to adopt one requiring propeller guards, a unanimous Supreme Court held that the decision not to adopt a regulation did not impliedly preempt a state common-law claim:

> We first consider, and reject, respondent's reliance on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats. It is quite wrong to view that decision as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation. The decision in 1990 to accept the subcommittee's recommendation to "take no regulatory action," App. 80, left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, if a state common-law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, pre-emption would occur. This, however, is not such a case.

*Id.* at 67, 123 S.Ct. at 528.

The Court also distinguished *Geier* and the regulatory history at issue there; it noted that although the Coast Guard's decision not to require propeller guards—which "presents a sharp contrast to the decision" that was given preemptive effect in *Geier*— was undoubtedly intentional and carefully considered, that decision did not convey an authoritative message of a federal policy against propeller guards.[6] *Id.*

---

[6]     MCI also relies on two unpublished trial court decisions that were not appealed: *Surles v. Greyhound Lines, Inc.*, 2005 WL 1703153 (E.D. Tenn. July 20, 2005), and *Schunck v. Delaware Transit Corp.*, 2007 WL 1748647 (Del. Super. Ct. June 1, 2007). *Surles*, like this case, involved a claim that seatbelts should have been installed on an MCI bus operated by Greyhound. The district court focused— incorrectly under *Sprietsma*, in our view—on "whether a common law claim would conflict with the agency's *reasons* for declining to regulate." *Surles*, 2005 WL 1703153, at *6. In *Sprietsma*, the Court took

The Safety Act's saving clause[7] allows state common law to impose higher standards, assuming they do not actually conflict with federal law or "stand as an obstacle to the accomplishment and execution" of federal purposes and objectives. *Great Dane,* 52 S.W.3d at 746-47 (citing 15 U.S.C. § 1397(k) (recodified at 49 U.S.C. § 30103(e)), and quoting *Geier,* 529 U.S. at 868, 120 S.Ct. at 1918 ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions. . . .")). We hold that the Safety Act and FMVSS 208 do not impliedly preempt the Plaintiffs' common-law claims relating to MCI's failure to have installed passenger seatbelts on the MCI bus at issue because that claim is not in actual conflict with federal law or federal purposes and objectives.

## B. Laminated Glass Side Windows

We next address MCI's point that the Plaintiffs' state common-law defective design claims regarding laminated passenger windows are impliedly preempted by

---

full note of the Coast Guard's explanation why it did not require propeller guards, and that decision did not convey an authoritative message of a federal policy against propeller guards. *Sprietsma,* 537 U.S. at 61-62, 66-67, 123 S.Ct. at 525-28. Likewise, NHTSA has not conveyed an authoritative message against passenger seatbelts in motor coach buses. We disagree with *Surles.* We disagree as well with the analysis in *Schunck,* which also concerned a claim that seatbelts should have been installed on a transit bus. There the trial court focused—incorrectly in our view—on a supposed "10,000 pound weight standard" and on the fact that NHTSA requires passenger restraints on buses weighing less than 10,000 pounds. *Schunck,* 2007 WL 1748647, at *3. That analysis, like the one in *Surles,* misses the mark set in *Myrick* and *Sprietsma* and misapplies *Geier.*

We find inapposite *Hurley v. Motor Coach Indus., Inc.,* 222 F.3d 377 (7th Cir. 2000), which involved claims by a bus driver that MCI's bus was defective because it was equipped only with a two-point lap belt. *Hurley* did not involve passenger seatbelts, and because FMVSS 208 does regulate bus driver restraint and protection systems and provides options for bus driver restraint systems, *Geier* did apply to impliedly preempt the plaintiffs' claims that a three-point seatbelt, an airbag, and a steel cage for the driver were all required. *Id.* at 380-82.

[7]    49 U.S.C. § 30103(e) ("Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law.").

federal law.  The jury found that there was a design defect in the bus because laminated glass was not used in the side passenger windows.

FMVSS 205 is the safety standard applicable to the requirements for windows in "multiple passenger vehicles."  49 C.F.R. 571.205.  The standard provides that "glazing materials for use in motor vehicles must conform to ANSI/SAE Z26.1-1996."  49 C.F.R. 571.205(S5.1).  At the time the bus at issue was manufactured, ANSI/SAE Z26.1-1996 provided a bus manufacturer could use either laminated or tempered glass in the passenger windows.[8]  The Plaintiffs note that the windows in the subject bus were equipped with two panes of tempered glass and point to evidence that, since 1970, MCI has used two types of glazing for passenger windows:  (1) a single pane of laminated glass, and (2) a dual pane system, with one pane of laminated glass and one pane of tempered glass.  The parties do not dispute that the subject bus's passenger windows complied with FMVSS 205 and ANSI/SAE Z26.1-1996.

In *O'Hara v. General Motors Corp.*, 508 F.3d 753 (5th Cir. 2007), a minor was seriously injured when she was partially ejected from the passenger side window of a 2004 Chevrolet Tahoe during a rollover accident.  In their suit against General Motors, the plaintiffs claimed that GM's use of tempered glass in the side windows was unreasonably dangerous and that the use of advanced glazing (laminated glazing and

---

[8]    The term "laminated glass" means two or more pieces of sheet, plate, or float glass bonded together by an intervening layer or layers of plastic material.  It will crack or break under sufficient impact, but the pieces of glass tend to adhere to the plastic.  If a hole is produced, the edges are likely to be less jagged than would be the case with ordinary annealed glass.  ANSI/SAE Z26.1-1996 § 1.6.
        The term "tempered glass" means a single piece of specially treated sheet, plate, or float glass possessing mechanical strength substantially higher than annealed glass.  When broken at any point, the entire piece breaks into small pieces that have relatively dull edges as compared to those of broken pieces of annealed glass.  *Id.* at § 1.21.

glass-plastic glazing material) would have decreased the likelihood of passenger ejection. The district court found that the plaintiffs' claims were impliedly preempted by FMVSS 205. *See O'Hara v. General Motors Corp.,* 2006 WL 1094427 (N.D. Tex. Apr. 25, 2006). On appeal, the Fifth Circuit addressed the precise issue before us: "This appeal is about whether FMVSS 205, which governs motor vehicle glazing safety, preempts a common law suit alleging that GM's use of a permitted glazing technology was unsafe. We are the first appellate court to rule on this question." *O'Hara,* 508 F.3d at 757.

After detailing federal policy and NHTSA's activity relating to FMVSS 205 and applying *Geier* and *Sprietsma*, the court held that the plaintiffs' claims were not impliedly preempted. *Id.* at 759-63. "Because we find that FMVSS 205 differs significantly from FMVSS 208 and does not establish a federal policy which would be frustrated by a state common law rule requiring advanced glazing in side windows, we hold that the O'Haras' suit is not preempted." *Id.* at 758.

At least two federal district courts have followed *O'Hara. See Spruell v. Ford Motor Co.,* 2008 WL 906648 (W.D. Ark. Apr. 1, 2008); *Burns v. Ford Motor Co.,* 2008 WL 222711 (W.D. Ark. Jan. 24, 2008). We will likewise. Based on the Fifth Circuit's careful analysis, we hold that the Plaintiffs' design defect claims relating to MCI's failure to use laminated glass in the side passenger windows are not impliedly preempted by FMVSS 205. We overrule MCI's third issue. Finding that Plaintiffs' claims are not preempted by federal law, we turn to MCI's state-related issues.

### III. Legal Sufficiency of the Evidence

MCI's fourth and fifth issues assert that the evidence is legally and factually insufficient to support the jury's design defect and causation findings. We will address MCI's legal sufficiency complaints and its sixth issue, which complains that the trial court improperly denied MCI's *Daubert* challenge to one of the Plaintiffs' experts.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822 (Tex. 2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

#### A. Safer Alternative Design

MCI's fourth issue asserts that there is legally insufficient evidence of a safer alternative design for three-point seatbelts, focusing primarily on the testimony of Plaintiffs' structural engineering expert Lonney Pauls. We will therefore address MCI's sixth issue at this point.

##### 1. Qualified Expert

MCI argues that Pauls was unqualified to give opinion testimony about seatbelts

in buses.  The trial court serves as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, and it has broad discretion to determine the admissibility of evidence.  *General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 590 (Tex. 1999); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995).

The Rules of Evidence provide: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise."  TEX. R. EVID. 702. To establish a witness's expert qualifications, the party calling the witness must show "that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject."  *Roberts v. Williamson,* 111 S.W.3d 113, 121 (Tex. 2003) (quoting *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex. 1996) (quoting Rule 702)).  Whether a witness is qualified to offer expert testimony is a matter committed to the trial court's discretion. *Broders,* 924 S.W.2d at 151.

MCI points to the following regarding Pauls's alleged lack of qualifications:  he has never helped or advised a bus manufacturer; he has never actually engineered seatbelt installation, the design of a seat to hold the loads of a seatbelt, or the design of the anchors to hold the seat load; this was the first case in which he studied occupant protection; and he has no degree or teaching experience in the area of occupant protection.  The main problem with MCI's complaint about Pauls's qualifications is that the alleged testimony (from Volume 11 of the reporter's record) that MCI relies on was

that of Carl Nash, the former NHTSA executive, not Pauls.

Pauls, a structural engineer, testified about the structural characteristics of the bus and its ability to support seatbelts. He has a bachelor's degree in mechanical engineering and master's degree in Applied Mechanics, which is the advanced study of structures, structural dynamics, advanced dynamics, gas dynamics, fluid dynamics, and finite element methods. Among other things (such as designing the suspension for NASA's lunar rover while employed by General Motors), Pauls has: (1) performed all of the structural analysis and design on NHTSA's Unitized Safety School Bus project, including seat supports, which led to the development of FMVSS 222; (2) performed data analysis of bus-seat testing for the U.S. Department of Transportation; and (3) designed computer modeling programs to simulate the performance of seatbelt and airbag systems. He had been hired by Greyhound, MCI's former owner, to perform structural analysis on an MCI motor coach, and he actually worked in an MCI facility to help it design a remedy for structural cracking in its buses. One area in which Pauls testified in this case was his description of how MCI's motor coach could have been retrofitted with seatbelts.

The trial court did not abuse its discretion in finding that Pauls was qualified as an expert in this case. We overrule MCI's sixth issue.

### 2. *Specific Design to Install Three-point Seatbelts*

A design defect renders a product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. A plaintiff must prove that there is a safer alternative design in order to recover under a design defect theory. An alternative design must substantially reduce the risk of injury and be both

economically and technologically feasible.

*Sanchez*, 997 S.W.2d at 588 (footnotes and citations omitted); *see General Motors Corp. v. Burry*, 203 S.W.3d 514, 533 (Tex. App.—Fort Worth 2006, pet. denied); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.005 (Vernon 2005). A plaintiff can prove technological feasibility of a safer alternative design with evidence that another manufacturer uses it. *See Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980); *Honda of Am. Mfg. v. Norman*, 104 S.W.3d 600, 607 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

The jury was given the following instruction in the design defect question on the absence of passenger seatbelts:

> A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design.
>
> "Safer alternative design" means a product design other than the one actually used that in reasonable probability--
>
> (1)    would have prevented or significantly reduced the risk of the injury in question without substantially impairing the product's utility; and
>
> (2)    was economically and technologically feasible at the time the product left the control of MCI by the application of existing or reasonably achievable scientific knowledge.

We review the sufficiency of the evidence in light of this instruction. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

MCI first claims that there is legally insufficient evidence of a specific design to install three-point seatbelts in the motor coach bus in question. MCI posits that Pauls's

retrofit design to supposedly strengthen the bus structure so that it could accommodate seats with seatbelts was only conceptual and thus legally insufficient.

Pauls's principal opinion was that the MCI motor coach bus could have been modified to handle a three-point seatbelt system without unreasonable additional weight or cost and without significantly altering the "semimonocoque" structure (a structure whose "skin" supports some of the load but also has underlying construction that supports most of the load) of the bus and without interfering with or impairing its utility. He summarily stated that modifying the MCI bus was economically and technologically feasible at the time it left MCI's control; specifically, Pauls testified that the bus's structure was inadequate to support seats with three-point seatbelts, so he created a concept retrofit design of the bus in question that increased the bus structure's strength so that it could accommodate anchored seats with three-point seatbelts. He used a mathematical engineering software program to calculate the size, strength, and location of the retrofit materials needed to support such seats in a crash situation that would meet FMVSS 210 crash standards. Pauls opined that the cost of his retrofit to the bus in question was $3,910 per bus.

MCI asserts four particular complaints about Pauls's testimony. Its first two complaints are that there is no testimony about the details or manner in which the seatbelts would be installed and that Pauls's concept used the measurements of the Australian-made "G-2 StyleRide" seat, which was not approved until mid-1996, which was after MCI built the bus in question. MCI's other two complaints are that Pauls did not offer a "design" of how the seatbelts would be attached and an economic and

technological study of that design; he offered only an incomplete design showing where some of the seatbelts could be attached and he did not determine feasibility for *every* seat in the bus.

Pauls said that he could have used other comparable available Australian seats with his retrofit analysis. Also, Pauls was not requested to develop a seat and seatbelt system—his sole task was to create a retrofit concept design for the MCI bus to support such a seat and seatbelt system—and Noel Dabelstein, the leading Australian manufacturer of bus seats with three-point seatbelts, testified that bus seats with three-point seatbelts were commercially available for purchase by American bus manufacturers as early as 1994 and that the installation of seatbelts on motor coaches did not require significant changes in bus structure or design. The Plaintiffs also submitted evidence that, by 1996, other bus manufacturers were selling buses equipped with three-point seatbelts, and the following countries had begun requiring seatbelts in motor coaches: Austria, Belgium, Denmark, Finland, France, Germany, Greece, Italy, Ireland, Luxembourg, the Netherlands, Portugal, Spain, Sweden, and the United Kingdom.

Virgil Hoogestraat, MCI's Vice President of Engineering, essentially conceded the economic and technological feasibility of installing a three-point seatbelt system on the bus in question:

> Q. . . . certainly there's nothing from an engineering feasibility standpoint that would stand as an insurmountable barrier for getting seat belts in passenger buses. That could be done?
>
> A. We could do that if we were required to do that.

Q. All right. Or if you chose to do it?

A. If we knew we should be doing that, we would do it.

Q. Okay. So it's not financial or engineering feasibility that's the issue; it is truly a question of MCI saying we are not convinced and we have not yet been convinced that putting seat belts in our buses for our passengers' use would be of a safety benefit to them?

A. I do not know nor have I been involved in anything where somebody said this would be beneficial.

Q. All right. But my question is: It is not now nor has it ever been a situation where MCI says we don't put seat belts in our buses because we can't figure out how to do it or we don't want to pay for it. MCI has always been of the position that says the reason we're not putting seat belts in our buses is because we are not convinced that there would be a benefit to our passengers by having them?

A. Yes, sir.

And while Robert Kadlec, MCI's bus structure expert, disagreed with Pauls' retrofit concept design, he admitted that "engineeringwise, a motor coach could be built with three-point seat belts."

Pauls admittedly did not create drawings or a prototype for crash-testing, nor did he design the actual three-point seatbelt system that would be installed in his concept retrofit design. Pauls also admittedly did not create his retrofit design for the entire bus; he did it for only one-third of the bus structure, explaining that his focus was to create and mathematically test a retrofit for the largest bracket in the bus structure to determine the cost (economic) and weight (technological) feasibility of his concept.

With regard to Pauls's retrofit concept design, the Plaintiffs did not have to build and test a prototype to prove a safer alternative design. *Sanchez,* 997 S.W.2d at 592.

"A design need only prove 'capable of being developed.'" *Id.* (quoting *Boatland*, 609 S.W.2d at 748. "The *Restatement (Third) of Torts: Products Liability* takes the position that 'qualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale.'" *Id.* (citing RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f (1998)). Pauls's retrofit concept design is some evidence that reasonably supports the conclusion that a safer alternative design of the MCI bus was capable of being developed.

Based on the foregoing—and viewing Pauls's testimony and the other noted evidence in the light most favorable to the verdict—we conclude that there is at least some evidence, more than a scintilla, of the existence of a safer alternative design with respect to the installation of three-point seatbelts in the MCI bus at issue.

### 3. Installing Seatbelts Would Protect Greatest Number

MCI next asserts that there is no evidence "that seatbelts would be the most effective safety system in all bus accidents." MCI concedes that seatbelts offer the best protection for bus rollovers (and "tip-overs") while pointing to cross-examination testimony of one of the Plaintiffs' experts, Anil Khadilkar, Ph.D., a transportation safety expert, that rollovers and tip-overs occur far less frequently than do front, rear-end, and side-impact collisions. MCI also points to Dr. Khadilkar's agreement that passengers on some motor coaches socialize while traveling and if a passenger is socializing (*e.g.*, turning in her seat to talk to another passenger sitting behind her) while wearing a three-point seatbelt and a front, rear-end, or side-impact collision occurs, the seatbelted

passenger can be injured by wearing the seatbelt improperly because she is out of position at the time of the collision.[9] Thus, MCI concludes, there is legally insufficient evidence that the use of seatbelts would protect against the greatest risk to the greatest number of people.

"[A] plaintiff complaining of a design defect is required to show that 'the safety benefits from its proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety'—that is, that the alternative design not only would have reduced the risk of harm in the instant case, but also would not, 'under other circumstances, impose an equal or greater risk of harm.'" *Norman*, 104 S.W.3d at 605 (quoting *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998)); *see also General Motors Corp. v. Harper*, 61 S.W.3d 118, 125 (Tex. App.—Eastland 2001, pet. denied) (quoting RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 16 cmt. b (1998)) ("the alternative to the product design must increase the overall safety of the product. It is not sufficient that the alternative design would have reduced or prevented the harm the plaintiff suffered if the alternative would introduce into the product other dangers of equal or greater magnitude.")

The Plaintiffs argue that the safety benefit of seatbelts in buses is partly intuitive; we agree with that sentiment. The Plaintiffs also put into evidence numerous scientific studies and papers concluding that seatbelts increase safety for motor coach passengers, and several witnesses, including Dabelstein, Dr. Khadilkar, Dr. Joseph Burton (a

---

[9] Dr. Khadilkar added that the risk of an "out-of-position" seatbelt injury is far less in a bus than in a car because cars have such a lower mass.

forensic pathologist), and Dr. John Lenox (a physician and a biomechanical engineer) testified that passenger seatbelts in motor coaches significantly increase occupant safety and provide the best occupant protection in any crash scenario. Dr. Khadilkar said that a motor coach with three-point seatbelts is not more dangerous and that to his knowledge, no scientific study has concluded that three-point seatbelts make motor coaches more dangerous. MCI's Hoogestraat was also unaware of any such articles or studies.

Dr. Khadilkar also testified about NHTSA's testing of school buses that compared compartmentalization with seatbelts, and although seatbelts were not mandated for school buses because of policy reasons unique to school buses, the testing showed that three-point seatbelts provided superior occupant protection. We conclude that there is at least some evidence, more than a scintilla, that three-point seatbelts not only would have reduced the risk of harm in the instant case, but also would not, under other circumstances, impose an equal or greater risk of harm.

### B. Producing Cause—Failure to Install Seatbelts

With respect to Melvin Akers, who was ejected and killed in the accident, MCI asserts that the undisputed evidence shows that he would not have been saved by a seatbelt, pointing to testimony of Dr. Burton, the Plaintiffs' causation expert. Dr. Burton first testified that a three-point seatbelt would not have prevented Akers's head and upper torso from being ejected if the window glass did not stay in place: "the only way to guarantee that Melvin Akers survives this is that Melvin Akers has a restraint on, belt restraint, and Melvin Akers has a glass of some type that stays inside the window to

prevent his head, which is going to be right up against the window opening, from going out of the bus when it rolls over." He later opined that Akers would not have died or sustained serious injury if he had been restrained by a three-point seatbelt or if the glass had not come out. There is at least some evidence, more than a scintilla, that the failure to install three-point seatbelts was a producing cause of Akers's death.

MCI next asserts that for Judy Benson, Jim Freeman (whose wife was killed in the accident), Elaine Horton, Alan Horton, and Robert Kuryla, there is legally insufficient evidence that, had they been wearing seatbelts, they would have suffered less severe injuries. Dr. Burton admitted that had they been wearing seatbelts, he could not say that they would not have been injured to the extent that they were, but he qualified that by adding that seatbelts would have decreased but not eliminated their soft-tissue injuries. There thus is at least some evidence, more than a scintilla, that the failure to install three-point seatbelts was a producing cause of the personal injuries of Judy Benson, Jim Freeman, Elaine Horton, Alan Horton, and Robert Kuryla.

### C. Producing Cause—Failure to Install Laminated Glass

Finally, MCI contends that there is no evidence that the failure to install laminated glass was a producing cause of the Plaintiffs' injuries. MCI's sole basis for this contention is that, because the laminated-glass windshield of the bus completely came out, laminated-glass passenger windows also would have come out, and thus there is no evidence that the failure to install laminated-glass passenger windows could have been a producing cause of the injuries and deaths of the passengers who were ejected.

In the motor vehicle industry, laminated glass is often referred to as "occupant retention glazing." The Plaintiffs' glazing expert, Herbert Yudenfriend, testified that laminated glass is composed of two panes of glass with a supporting internal layer of polyvinyl butyral (PVB). He explained that because of the PVB layer's strength, the glass retains its penetration resistance and occupant-retention characteristics even when the actual glass breaks. Yudenfriend stated that rubber gaskets had been used to attach the laminated windshield in the MCI bus, and he opined that bonding or gluing should have been used. We thus agree with the Plaintiffs that there is some evidence that bonded laminated side-passenger windows could have prevented occupant ejection in the accident.

In conclusion, we overrule MCI's legal sufficiency complaints in its fourth and fifth issues.

## IV. Proportionate Responsibility

We now turn to MCI's first issue, which asserts that the trial court abused its discretion and committed harmful error by not submitting questions to the jury concerning the bus driver's or his employer's proportionate responsibility as "settling parties" or as "responsible third parties."

### A. Responsible Third Parties

We begin with MCI's assertion that the trial court erred in not submitting to the jury the proportionate responsibility of Cummings or Central Texas as "responsible third parties" under the applicable version of Chapter 33 of the civil practice and

remedies code.[10]  *See* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972-73 (amended 2003) (current version at TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.003, 33.004, 33.011(6) (Vernon Supp. 2007)).  Because that version required MCI to actually join Cummings and Central Texas as responsible third parties,[11] we agree with the Plaintiffs that MCI's complaint is actually an attack on the trial court's denial of MCI's motion for leave to join Cummings and Central Texas as responsible third parties.  We review that denial for abuse of discretion.  *See In re Arthur Anderson,* 121 S.W.3d 471, 483-85 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding).

The first of the Plaintiffs' suits against MCI was filed on June 26, 2003, and MCI answered on August 14.  More than eighteen months later, and on the day limitations would have expired—February 14, 2005, MCI filed a motion for leave to join Cummings and Central Texas as responsible third parties.  At that time, trial was set for August 1, 2005, but MCI did not seek a hearing on its motion for leave until late June, and the hearing in which the trial court denied MCI's motion for leave took place on July 15.[12]

---

[10]     This case is governed by the version of chapter 33 in effect before July 1, 2003 because this action was filed before that date.  *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.05, 23.02(c), 2003 Tex. Gen. Laws 847, 856, 899.

[11]     *See In re Grant Thornton, L.L.P.,* 2004 WL 114978, at *2 (Tex. App.—Houston [14th Dist.] Jan. 26, 2004, no pet.) (mem. op.) ("The express language of the Proportionate Responsibility Statute in effect for this case requires that responsible third parties be joined in the lawsuit, not simply named or designated. . . . Sub-sections 33.004(d) and (e) also use the word "join" and discuss filing a third party claim to bring responsible third parties into a lawsuit."); *see id.* at n.2 ("Because this action was filed before July 1, 2003, relator was required to serve responsible third parties.").

[12]     Moreover, in the five-month period after filing its motion for leave, MCI appears to never have served Cummings and Central Texas with MCI's third-party petition joining them as responsible third parties.  *See, e.g., In re Grant Thornton,* 2004 WL 114978, at *2 ("Because relator's designated responsible third parties were never served with a petition and citation, they were not parties to the suit at the time the court purportedly struck them.").  The Plaintiffs additionally assert that this lack of due diligence raised a statute of limitations problem for MCI as to Cummings and Central Texas.

Because MCI waited until the eve of trial to seek to join Cummings and Central Texas as responsible third parties,[13] we cannot say that the trial court abused its discretion in denying MCI's motion for leave to join Cummings and Central Texas as responsible third parties. *See In re Arthur Anderson*, 121 S.W.3d at 483 ("The court may indeed consider whether joinder will delay the trial. However, the key is whether a delay is reasonable under the facts and circumstances of the suit, keeping in mind the history of the suit, and not simply that a delay will occur.") (citing and quoting TEX. R. CIV. P. 37 (allowing additional parties to be brought in "but not at a time or in a manner to *unreasonably* delay the trial of the case")). We hold that because Cummings and Central Texas were not properly joined by MCI as responsible third parties, the trial court did not abuse its discretion in refusing to submit to the jury their proportionate responsibility as "responsible third parties."

## B. "Settling Person"

Finally, we address whether Central Texas (we include Cummings within Central Texas for this issue) is a "settling person" whose proportionate responsibility should have been submitted to the jury. We review the trial court's refusal of MCI's request to include Central Texas as a "settling person" in a proportionate responsibility question in the jury charge for abuse of discretion. *See In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 837 (Tex. App.—Fort Worth 2006, no pet.). The trial court is afforded broad discretion, but only so long as the

---

[13] The Plaintiffs note that as of July 15, the parties were engaged in final trial preparation, discovery had closed, and trial was scheduled to begin in two weeks.

charge is legally correct.  *Rodriguez,* 995 S.W.2d at 664.

### 1. The Bankruptcy Proceedings

Next, we outline the complex factual and procedural history relating to the Plaintiffs' claims and recoveries in the Central Texas bankruptcy proceeding.  On April 11, 2003—just two months after the accident—the Central Texas entities filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Western District of Texas.  Cummings filed a Chapter 7 bankruptcy petition shortly thereafter.  At a hearing on Central Texas' motion to extend the stay in regard to its liability insurance carrier, the bankruptcy court determined that Central Texas' liability insurance policy and its proceeds were property of Central Texas' bankruptcy estate and ordered a stay as to any claimant's actions to recover on a claim against that policy or its proceeds; it also ordered the insurer, which was not disputing coverage for the crash, from accepting any settlement demands or paying any claims out of the proceeds without prior authority of the bankruptcy court.

On the motion of the family and estate of the victims in the SUV (the Dobelbowers) that had collided with the MCI bus, on June 30 the bankruptcy court ordered Central Texas' liability insurer to pay its $5 million policy limits into the bankruptcy court's registry and ordered that the funds be held in an interest-bearing account.  The principal ground for that motion was to have the $5 million policy limits placed in an interest-bearing account because the bus-crash claimants' damages would greatly exceed $5 million and the accrual of interest would be somewhat helpful for the victims.  Motions were also filed calling for the bankruptcy court to order various forms

MCI v. Hinton                                                                                                   Page 32

of ADR to allocate the $5 million among the numerous claimants (including the Plaintiffs, who filed proofs of claims against the Central Texas entities), and the bankruptcy court first ordered nonbinding mediation, which had already been set up and scheduled by many of the claimants. The mediation resulted in an apportionment schedule in which each claimant was assigned a specific percentage of the insurance proceeds,[14] and on October 21, 2003, the bankruptcy court granted a motion by some of the Plaintiffs for an order approving the Apportionment Plan, which included a Litigation Plan.

### 2. The Apportionment Plan

The Apportionment Plan provided that the "Bus Crash Claimants" (which included the Plaintiffs) "may elect to accept the percentage of the Liability Fund [the $5 million insurance proceeds and accrued interest] specifically assigned to that individual's claims by the mediator as set forth in the Apportionment Schedule." It also provided: "Any Bus Crash Claimants may elect to decline acceptance of the percentage of the Liability Fund specifically assigned to that individual's claim in the Apportionment Schedule," in which case the claimant "will be bound by the terms and conditions of the Litigation Plan." Some of the bus passengers accepted the mediator's assigned percentages and were paid under the apportionment schedule, but all of the Plaintiffs chose to have their claims against Central Texas and Cummings resolved under the Litigation Plan. About one-half of the $5 million was allocated in the Apportionment Plan; the other half was held for those participating in the Litigation

---

[14] For example, Appellee James Hinton was assigned 6.5010% of the insurance proceeds.

Plan.

### 3. The Litigation Plan

Under the Litigation Plan, the claimants were to try their cases to a verdict before a special judge and under procedural rules agreed upon by all the participants. The claimants were to recover from the fund left over after payment of the apportionment claims, which was approximately $2.5 million and was termed the Litigation Fund. Their recovery was capped at 110% of the percentage assigned by the mediator.

The Litigation Plan provided:

4) Each participant in the Litigation Plan agrees that any recovery from the Litigation Fund will necessitate that the claimant prove by a preponderance of the evidence the following factual issues:
   a. that the negligence of Central Texas Trails, Inc., Kincannon Enterprises, Inc., Central Texas Bus Lines, Inc., or Johnny M. Cummings was a proximate cause of the participant's injuries and/or damages; and
   b. the amount of damages suffered by the claimant as a result of that negligence.

Neither the Litigation Plan nor the bankruptcy court's approval order included a schedule or deadlines for the Plan's implementation and disposition. In October 2004, after having confirmed Central Texas' reorganization plan, the bankruptcy court entered a final decree closing the bankruptcy case, even though nothing had occurred under the Litigation Plan.

The Plaintiffs' case against MCI was tried in October 2005.[15] In offers of proof,

---

[15] Before trial, in September 2005, MCI and its affiliate companies who were creditors in Central Texas' bankruptcy had filed a motion to reopen the bankruptcy case and a motion to enforce the Litigation Plan, complaining that no action had taken place to implement the Litigation Plan. MCI contended that the Plaintiffs should be prohibited from obtaining a double recovery—one from the Litigation Plan and one from the state-court suit against MCI—and that, should the Plaintiffs obtain a

MCI elicited testimony from many of the Plaintiffs about their proofs of claims against Central Texas in the bankruptcy case. The Plaintiffs testified that they had not made claims in the bankruptcy case against Central Texas, that they did not blame Cummings for the accident, and that they were not aware of the details of the Apportionment Plan. After the trial, Donnie Hagans, a claimant who had accepted payment under the Apportionment Plan, filed a motion in the bankruptcy court "to withdraw, strike or deny" the Plaintiffs' proofs of claims based on their inconsistent offer-of-proof testimony.

The bankruptcy court held show-cause hearings in January 2006 on these motions and noted significant flaws in the Litigation Plan: it did not contain a provision for getting money paid out of the Litigation Fund; it did not provide for the disposition of any leftover funds; and it had no deadlines or schedules. Thereafter, the Plaintiffs agreed on a "Special Judge," and the bankruptcy court ordered the Bus Crash Claimants (the Plaintiffs) to submit evidence to the Special Judge by February 6, 2006 and to appear on that date at the office of one of the attorneys for several of the Plaintiffs to present oral argument or testimony before the Special Judge. Central Texas was given the opportunity to appear before and submit evidence to the Special Judge; MCI was not. The Special Judge was given until March 15, 2006 to render a verdict and report and file them with the bankruptcy court. The order included the following stipulation:

judgment against MCI, it should receive a credit for any amounts received by the Plaintiffs under the Litigation Plan.

The Litigation Plan Participants [the Plaintiffs] will not move for judgment on the state court verdict prior to the final approval of disbursements, if any, to the Litigation Plan Participants in the Bankruptcy Court absent extenuating circumstances. The Litigation Plan Participants will not oppose a motion filed by Motor Coach in the state court action for credits on the judgment based upon the "one satisfaction rule" as a result of the receipt of any funds disbursed to them from the Litigation Plan. *However, the Litigation Plan Participants will oppose any motion filed by Motor Coach Industries which seeks to deem funds disbursed form the Litigation Fund to be "settlement credits," or a settlement under Chapter 33 of the Texas Civil Practice and Remedies Code.* [Emphasis added.]

The Special Judge rendered a "Special Verdict, Report and Recommendation" after conducting the February 6 "hearing." It included a recitation of all of the materials that the Special Judge had reviewed (including the reporter's record in this case) and a listing of the parties appearing on February 6. No one appeared on behalf of Central Texas or Cummings. The Special Judge made the following liability "finding":

Based on the materials I have reviewed, it is my determination that the negligence of the bus driver, Mr. Johnny Cummings, was a proximate cause of the accident that produced the Participants' [Plaintiffs'] injuries and damages. I further find that Mr. Cummings was acting within the course and scope of his duties for one or more Debtors [Central Texas]. Therefore, under Texas law, one or more Debtors are vicariously liable for his negligence.

I have not endeavored, based upon my understanding of my duties under this Court's Order, to make a complete or comparative assessment of all parties potentially liable for causing either the accident or the resulting damages.

The Special Judge adopted the MCI trial's jury findings as a cap on the damages award and then made a slight adjustment to the percentages found by the mediator. The bankruptcy court approved the Special Judge's finding, and each Plaintiff received within 2% of the amount allocated in the Apportionment Plan, except for Robert

Kuryla, whose award was reduced because the jury had awarded him less than his allocation.

MCI then moved the trial court for a settlement credit for the Central Texas insurance monies paid to the Plaintiffs from the bankruptcy court. But rather than giving a settlement credit, the trial court recited in the final judgment that it has been "partially satisfied" as to each Plaintiff in the exact amount that each had received from the Litigation Fund.

### 4. Chapter 33

As noted above, the statutory scheme under the 1995 version of Chapter 33 applies to this case. It applied to a broad range of cases, including "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 971 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 33.002 (Vernon Supp. 2007)). Former section 33.003 provided that the trier of fact shall determine the percentage of responsibility for each claimant, each defendant, each *settling person*, and each responsible third party who has been joined under section 33.004. *Id.* at 1995 Tex. Gen. Laws 971, 972-73 (amended 2003) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (Vernon Supp. 2007)); *see also* TEX. R. CIV. P. 277 (requiring trial court to submit jury question when loss is to be apportioned). "Settling person" was defined by former section 33.011(5) as "a person who at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability . . . for

which recovery of damages is sought." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, 1987 Tex. Gen. Laws 37, 41 (amended 1995 and 2003) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(5) (Vernon Supp. 2007)).

Former section 33.013 provided, with certain exceptions, that a defendant was liable only for the percentage of responsibility found by the trier of fact, unless the percentage of responsibility exceeded fifty percent, in which case that defendant was jointly and severally liable for all of the claimant's recoverable damages.[16] It was therefore plainly in MCI's interest to have Central Texas' conduct (or that of Cummings, for whom Central Texas was vicariously liable) submitted to the jury to reduce MCI's percentage of responsibility, if any, and at a minimum to determine if its percentage of responsibility was under 51%, which would allow it to avoid joint and several liability for all of the Plaintiffs' damages. Conversely, because Central Texas was in bankruptcy, it was in the Plaintiffs' interest to have MCI found 100%, or at least 51%, responsible.

### 5. Discussion and Analysis

Based on the above, we now must determine whether Central Texas was a "settling person" under Chapter 33. That is, we address whether or not the Litigation Plan was a "settlement" between Central Texas and the Plaintiffs such that Central Texas was a "settling person" whose proportionate responsibility should have been submitted to the jury along with that of MCI. *See C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 320 (Tex. 1994) ("'settlement', as used in the Comparative

---

[16] Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271 (amended 1987, 1995, and 2003) ((current version at TEX. CIV. PRAC. & REM. CODE ANN. § 33.013 (Vernon Supp. 2007)).

Responsibility Law, means money or anything of value paid or promised to a claimant in consideration of potential liability").

As a threshold matter, we review MCI's contention that legally sufficient evidence supported the submission of Central Texas' proportionate responsibility. In addition to the statutory definition of settling person, former section 33.002(f) also required sufficient evidence to support the submission of that person's conduct in a proportionate responsibility question. Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972 (amended 2003) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(b (Vernon Supp. 2007)). We review that person's conduct for legal sufficiency. *Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 573 (Tex. App.—Houston [1st Dist.] 2004, no pet.). MCI points to evidence that Cummings was driving too fast, that he drove the bus into head-on traffic, and that the tread on one of the rear bus tires was too thin for the wet road conditions. The Plaintiffs make no argument that the evidence was legally insufficient. We conclude that there is some evidence to support the submission of Central Texas' conduct in a proportionate responsibility question.

We begin our settling-person analysis by noting that the Plaintiffs asserted tort claims against Central Texas in their bankruptcy proofs of claims. MCI asserts that Central Texas' liability insurer's tender of the $5 million policy limits to the bankruptcy court was a payment to the Plaintiffs in consideration of Central Texas' potential liability. The Plaintiffs argue that the money was tendered not to them, but to the bankruptcy court, and only because the bankruptcy court ordered it. That is only partially correct.

It is apparent from the various bankruptcy court documents (particularly the Dobelbowers' various motions relating to the $5 million policy proceeds and ADR procedures and the other parties' motions and responses relating to ADR) that all of the parties—the Bus Crash Claimants, Central Texas, and its liability insurer—were engaged in extensive, detailed discussions and negotiations over the $5 million and its fair division among all the claimants. Additionally, it appears that neither Central Texas nor its insurer opposed tendering the $5 million or participating in ADR proceedings to apportion the $5 million.[17]

Moreover, Central Texas' Second Amended Plan of Reorganization, which the Plaintiffs voted for and which the bankruptcy court approved, delineated the Bus Crash Claimants as a class of creditors with wrongful death and personal injury damages against Central Texas arising out of the crash and provided: "The Debtor [Central Texas] shall pay $7,000 annually to this class of creditor for five years." These payments began in 2004 and went partly into the Litigation Fund to be distributed under the Litigation Plan. We are now led to the crucial aspect of our inquiry: Did the Litigation Fund, which consisted of half of the insurance proceeds and Central Texas' direct annual payments, and the Litigation Plan, through which each Plaintiff's claim for a percentage of the Litigation Fund was "adjudicated," constitute payments *to the Plaintiffs* in consideration of potential liability and thereby render Central Texas a "settling person"? (Or more broadly, was the Litigation Plan a settlement between

---

[17]     The only major dispute between the Bus Crash Claimants and Central Texas and its insurer was whether the claimants would have to fully release Central Texas, Cummings, and the insurer.

Central Texas and the Plaintiffs?)  We answer "yes."

The tender of the $5 million to the bankruptcy court (half of which went to the Litigation Fund) and Central Texas' direct annual payments to the Litigation Fund, were indirect payments to the Plaintiffs in consideration of Central Texas' potential liability to the Plaintiffs, and the subsequent payments from that fund to the Plaintiffs were not contingent on the outcome of an adversarial or uncertain proceeding.  *Cf. Gilcrease v. Garlock, Inc.*, 211 S.W.3d 448, 452-55 (Tex. App.—El Paso 2006, no pet.) (holding that post-settlement bankruptcies of settling parties did not make settlements contingent and that defendant was entitled to credits, even though settlements had not been paid, and distinguishing settlements contingent on other litigation and uncertain bankruptcy proceedings) (citing *McNair v. Owens-Corning Fiberglas Corp.*, 890 F.2d 753 (5th Cir. 1989), and *Cimino v. Raymark Indus.*, 751 F. Supp. 649 (E.D. Tex. 1990), *aff'd in part, vacated in part on other grounds*, 151 F.3d 297 (5th Cir. 1998)).

The Plaintiffs contend that, because the hearing before the Special Judge and the bankruptcy court's order approving the Special Judge's report and the disbursements to the Plaintiffs occurred several months after the trial against MCI, there had been no adjudication or disbursements—no payments or promises to pay—out of the Litigation Fund at the time the case was submitted to the jury in the MCI trial.  The statute, however, defines a settling person as one who pays or promises to pay "at any time."  Thus, we give no weight to the timing of the Litigation Plan's hearing, verdict, and

actual disbursements;[18] as of the time of submission of this case to the jury, the Litigation Plan had been in place for over two years. We also give no credence to the *ipse dixit* statement in Central Texas' reorganization plan that "[s]ome of the bus crash claimants [the Plaintiffs] have not settled their claims against the Debtors [Central Texas]" and continue to be participants in the Litigation Plan.

The Plaintiffs' other arguments for why the Litigation Plan was not a settlement are that their claims against Central Texas were not settled, but were "adjudicated" under the bankruptcy court's orders (*via* the Litigation Plan), that they were required to prove Central Texas' negligence and their damages to the Special Judge to receive money from the Litigation Fund, and that they were exposed to receiving less money than originally allocated to them by the mediator. We are not persuaded.

Although the bankruptcy court entered an order approving the Litigation Plan, that plan was prepared by and agreed to by the Plaintiffs. Extensive negotiations took place before and after the mediation in which all the Bus Crash Claimants, including the Plaintiffs, agreed to an apportionment schedule in which each claimant was assigned a specific percentage of the Litigation Fund. Negotiations with Central Texas and its insurer also took place, and in its reorganization plan, Central Texas agreed to pay $7,000 a year for five years to benefit the Litigation Fund. The Plaintiffs, as a class of creditors, voted for this plan, which also included a provision discharging Central

---

[18] We acknowledge MCI's note on the treatment that the trial court's final judgment gives to the Litigation Fund payments to the Plaintiffs—as partial satisfactions of the judgment, rather than as settlement credits. But Central Texas was not a party to the judgment and thus could not have partially satisfied it, and these payments came from the Litigation Plan and were funded by Central Texas and its liability insurer in consideration of Central Texas' potential liability.

Texas from all debts, including the Plaintiffs' tort claims.

The Litigation Plan was structured to make the payments from the Litigation Fund to the Plaintiffs appear to be contingent on an adjudicative proceeding, but piercing it reveals no adversarial adjudication or uncertainty to render it contingent, and it has several indicia of a settlement. *Cf. Turoff*, 222 S.W.3d at 668 ("But the law on Mary Carter Agreements in Texas has evolved to include agreements that violate the principles laid out in *Elbaor* even if the precise structure of the agreement does not fit the precise pattern of an agreement previously determined to be in violation of public policy."). The money paid into the Litigation Fund was apparently nonrefundable, and thus unconditional; *i.e.*, nothing provided for its return or other disposition if the Plaintiffs did not prove the negligence of Central Texas or Cummings to the Special Judge. The Litigation Fund was plainly earmarked to be distributed to the Plaintiffs in the approximate percentages agreed to at the 2004 mediation. We have no reason to believe that the Special Judge acted other than in good faith, but the "hearing" before him was not adversarial. No interested parties (*e.g.*, Central Texas, Cummings, or MCI) participated to argue that Central Texas and Cummings were not negligent or to contest the Plaintiffs' injuries or the amount of their damages.[19] The payments that were to be made to the Plaintiffs as a result of the proceeding before the Special Judge were not contingent so as to render the Litigation Plan not a settlement for purposes of Chapter 33.

---

[19]    We view the Litigation Plan as a good-faith, albeit unsuccessful, *attempt* to avoid the possible detriment to the Plaintiffs if Central Texas' proportionate responsibility were submitted to the jury. Indeed, it had the stamp of approval of the bankruptcy court.

We summarize: As a result of the crash, Central Texas was potentially liable to the Plaintiffs; all of Central Texas' liability insurance proceeds were earmarked for the crash victims, and half of those proceeds, along with direct payments from Central Texas, were placed in a fund to be allocated among the Plaintiffs under procedures set up and controlled by the Plaintiffs with no adversary; the Plaintiffs voted for Central Texas' reorganization plan, which discharged all of Central Texas' debts, including its debts for the Plaintiffs' tort claims; all of the Plaintiffs received the approximate apportionment percentages that had been agreed to at the original mediation; and the payments were made to the Plaintiffs plainly in consideration of Central Texas' potential liability to them. This process was hardly a typical tort settlement, but it was a settlement and Central Texas was a settling person for purposes of Chapter 33. For these reasons, we hold that Cummings and Central Texas were "settling persons" under Chapter 33 and that the trial court erred in refusing MCI's request to submit their proportionate responsibility to the jury. *See Omega Contracting,* 191 S.W.3d at 837; *Olympic Arms,* 176 S.W.3d at 575.

We last address whether the trial court's error was harmful and warrants reversal. A reversal is warranted if the trial court denies a proper submission of a settling person's proportionate responsibility, and the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *Olympic Arms,* 176 S.W.3d at 576.

We found above that there was legally sufficient evidence of Central Texas' and Cummings's negligence. It is thus probable that the jury would have placed some of

the responsibility on them, and if MCI's proportionate responsibility were found to be less than 51%, it would have been liable for only its percentage of responsibility. Because the trial court's erroneous refusal to submit Central Texas or Cummings caused MCI to be 100% liable, that error was reasonably calculated to cause, and probably caused, the rendition of an improper judgment. *See Olympic Arms*, 176 S.W.3d at 576. We sustain in part MCI's first issue.

## V.  Issues Not Addressed

Because of our disposition of MCI's first issue, we will not address MCI's factual sufficiency complaints in issues four and five, nor will we address MCI's second (refusal to permit cross-examination) and seventh (charge error) issues. *See* TEX. R. APP. P. 47.1.

## VI.  Conclusion

Having sustained in part MCI's first issue, we reverse the trial court's judgment and remand this cause for further proceedings consistent with this opinion.


BILL VANCE
Justice

Before Chief Justice Gray,
        Justice Vance, and
        Justice Reyna
        (Chief Justice Gray dissenting)
Reversed and remanded
Opinion delivered and filed September 10, 2008
[CVPM]